## 45147. PATILLO v. THE STATE.
### (368 SE2d 493)

CLARKE, Presiding Justice.

Keith Patillo was convicted in Bibb County of malice murder and sentenced to death. This is his appeal.[1]

1. The victim, 19-year-old Stephanie McLamb, met Patillo one Sunday afternoon at Central City Park in Macon. He called her a few days later, and he and the victim and her friend Lisa met and spent several hours together, driving around in the defendant's car. Then Patillo stated that he had to meet his brother at eleven, and he dropped Lisa off at her home.

Around midnight, Patillo called his roommate, saying he needed a ride home; his car was stuck. The roommate picked him up at Central City Park. Patillo had blood on his legs and carried a blood-stained baseball bat. He explained that he had been attacked by two men. However, he did not want to call the police or to get his car that night. When he got home, he rinsed off the bat and took a bath.

The next morning, Charles Hamlin went to his okra field in the lower Poplar Street area of Macon, not far from the city's water and sewage treatment facility. A car was stuck in a muddy lane that partly circled the field, and Patillo was trying to get it out. Hamlin used his truck to pull the defendant's car free. Then he noticed some clothing near a "pile of brush . . . beside the ditch on the edge of the field," some 80 feet from where the defendant's car had been. Hamlin went to look, and, under the pile of brush, observed a nearly-nude female body. Patillo denied knowing anything about the body, and

---

[1] The defendant was sentenced to death on February 6, 1987. A motion for new trial was filed February 18, 1987, and denied March 23, 1987. The case was docketed in this court May 8, 1987. The defendant filed an extraordinary motion for new trial, and the case was remanded to the trial court for a hearing. The motion was heard August 11, 1987, and denied September 21, 1987. A notice of appeal was duly filed, and the case was redocketed in this court on October 26, 1987. On November 10, 1987, the defendant wrote to the trial court asking that his appeal "be stopped." His letter has been forwarded to this court, and filed with the record on appeal. Notwithstanding the defendant's request, we must review a death penalty case under the Unified Appeal Procedure (252 Ga. A-13 et seq.) and OCGA § 17-10-35. In conducting our review, we are guided by, but not limited to, the issues raised on behalf of the defendant by his attorneys on appeal. The case was orally argued January 13, 1988.

gave Hamlin a false name. Then he left, and Hamlin called the police.

In the meantime, the victim's mother had called the police when her daughter did not return home the night before. Lisa furnished the police with the defendant's first name, as well as a description of him and his car that matched the information given by Hamlin. Patillo was soon arrested.

He called his roommate from jail and apologized for what he had done, asking him not to "hate him for it." According to the roommate, "[Patillo] said that they had went down and had sex and they got stuck in the car and that she had threatened to call the police and say that he had raped her because he did not get her back home on time and he said, 'I just went berserk, I reckon. . . .'"

Patillo wrote his friend Gary French a letter, explaining what had happened as follows:

> Gary, I am sorry that I Did Knot come clean your house last Friday . . . I Had went off with a Girl and then we got Drunk and I decided that I wanted [to have sex]. to make a long Story short I got [messed] up and stayed out with her for a while Well, it was getting late and She was [complaining] about going Home and she [made me angry]. She kept on [messing] with me, Finley I got Ready to take her Home and the . . . car was stuck. So we decided to Just [have sex] for a while and then worry about the car. Well, we [did], and then we tryed to get the car but went nowhere so She started [complaining] to me and She said that she would just go get the police and tell them I raped her. Well after that she really had me [angry] so I decided that she was not going no where and then I killed her. So I am now in Jail for murder and I don't know when I will get out . . . . [A]s for "Steve," tell Him when you see Him that I might be out sooner than I think for pleading insanity and I will be looking for [him] He is next on my "list" Because I am sick and tired of everbody [messing] with me . . . . Hope to see you soon. and Don't Forget to tell Steve I am looking For [him] next and I mean that. He is next on the "park killings." tell him He better watch [himself] close because He Just might Have lusaville slugger printed In His Head next . . . .

The letter was signed, "Keith the 'Soko.'" Next to the signature was a drawing of a baseball bat.

The autopsist testified that there were at least 10 major blunt force lacerations about the victim's head, and others that were less severe. He also identified a number of "defensive" wounds on her hands and arms, indicating that she had tried unsuccessfully to ward

off the blows to her head.

The evidence, viewed in the light most favorable to the state, is sufficient to convince a rational trier of fact that the defendant is guilty beyond a reasonable doubt of the offense of malice murder. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Patillo was not charged with the offense of rape. However, sperm and seminal fluid were found in the victim's vagina, and the defendant admitted having sexual intercourse with her. The defendant cross-examined state's witnesses concerning whether a blanket had been found in his car and whether the victim's clothing had been torn, in an effort to support his theory that he was guilty only of voluntary manslaughter, i.e., that he and the victim had engaged in consensual sex but that, when she became concerned that she was going to be very late getting home and left, threatening to explain her lateness by claiming that Patillo had raped her, he flew into a rage and killed her. In these circumstances, the state did not err by arguing to the jury that it was a more plausible inference from the evidence that the defendant had raped and killed the victim and then got stuck in the mud some 80 feet away as he was trying to leave than that he and the victim had engaged in consensual sex in a mosquito-infested swamp or that the victim, with no inkling of possible danger, had attempted to leave the scene of her tryst with almost no clothes on. Compare *Lipham v. State,* 257 Ga. 808 (1 a) (364 SE2d 840) (1988); *Tucker v. Kemp,* 762 F2d 1480, 1506-07 (11th Cir. 1985).

3. On the Thursday before the trial began on Monday, the defendant moved for a continuance. His psychologist (retained with funds provided by the court) had administered certain psychological tests, including the Minnesota Multiphasic Personality Inventory, and had submitted them for a computer-assisted tabulation and analysis. She had not yet received the results; when she did, she would need "several hours" to review them.

The court denied the motion for continuance, stating, however, that

> [i]f after the voir dire process . . . Dr. Cleveland needs additional time . . . whatever time you all need to confer with her to be prepared for trial will be no problem at all . . . if you can show me that that would be of benefit to Mr. Patillo. But given . . . the time we have spent preparing for trial, the court feels comfortable in denying the motion for continuance.

The guilt phase of the trial concluded with the jury's verdict just before lunchtime on Friday. The court asked the defendant's lead attorney if he would be ready to proceed with the sentencing phase of

the trial at 3:00 p.m. He answered in the affirmative, and the defendant's psychologist testified that evening.

There was no abuse of discretion in the denial of a continuance. *Ealy v. State*, 251 Ga. 426 (3) (306 SE2d 275) (1983).

4. In *Giglio v. United States*, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972), the U. S. Supreme Court held that where the credibility of a prosecution witness is an important issue in the case, "evidence of any understanding or agreement" with that witness "for prosecutorial leniency" is relevant to the credibility of the witness, and should be disclosed to the defense. 405 U. S. at 151 and 155. The defendant claims the state failed to reveal to the defense that it had agreed to assist a convicted felon in exchange for his testimony, notwithstanding a defense *Giglio* motion explicitly requesting the disclosure of any such agreements. Resolution of this claim of error requires a consideration of the circumstances surrounding the pre- and post-trial discussions between the witness and the state and, as well, the evidence presented at the sentencing phase of the trial. In part (a), below, we summarize the relevant sentencing-phase evidence. In part (b), we set forth the evidence presented at the hearing on the extraordinary motion for new trial, and in part (c) we explain why we do not find reversible error.

(a) David Chatman was the state's only witness at the sentencing phase of the trial. He had a prior record of conviction for theft by deception and forgery, and was in jail because his probation was revoked. After revealing to the jury Chatman's criminal record and the reason for his incarceration, the state asked him if he had "made . . . any deals" in exchange for his testimony in this case. His answer was "no."

Chatman then testified that he had talked to Patillo in jail and that Patillo had explained his crime as follows:

He said that he was supposed to have her home at 12:30 and after he got his car stuck in the mud and he was trying to get her to calm down and she was fussing at him and she said she was going to . . . tell her mamma that he had raped her and he said that was the reason he lost his temper and he killed her.

Chatman further testified that Patillo had told him that

he hated women. . . . [W]hen he was small his stepmother . . . turned his daddy against him . . . [T]hey adopted a little girl . . . [and] wouldn't let him stay with them anymore. . . .

Chatman described an incident in which the stepmother had tried to embarrass the defendant, and testified that Patillo had explained his

feelings on the night of the murder thusly:

> [Patillo] said he just had nothing in him but hatred from constant hostility that he had had I reckon since he was young, things, you know that he was going through with his stepmother. He said at that particular time, that particular night, he said if anybody would have walked up on him, he probably would have killed them, too. . . . [H]e said [his stepmother] was lucky that he hadn't done something to her because he hated her.

Patillo's mitigation witnesses included several former foster parents, a psychologist, and some friends. According to his own witnesses, the defendant's original home life was violent. His parents fought a lot, and he was placed in permanent foster care when he was six years old. His mother visited him only one time, "promised a bunch of stuff," and never returned. When he was 14 or 15, he went to live with his father and stepmother. However, his stepmother disliked him and his father physically abused him, and he was soon removed from the home and returned to foster care. The psychologist testified that the defendant lacked self-confidence, depended on others, and was angry, hostile, and anxious.

(b) Chatman's probation was revoked on December 18, 1986.[2] On January 9, 1987, the trial judge in this case granted Patillo's motion to exclude his written statement to law enforcement officers. See *Edwards v. Arizona*, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981). Five days later, assistant district attorney Robin Odom received a letter from Chatman stating, in part: "I've had the chance to talk with Keith Patillo [about] . . . his case . . . and since the state can't use his own signed confession against him, I will testify in court to what he told me."

Chatman did testify, claiming at trial that there had been no "deals" in exchange for his testimony. After the trial, however, and after he was transferred from jail to the penitentiary in Jackson to serve his sentence, he wrote a series of letters to the district attorney in which he claimed that he had been promised that his probation would be reinstated if he testified and that, since the state had not lived up to its end of the agreement, he was going to "blow a whistle" and cause a "mistrial" in Patillo's case. He feared for his life if he remained in Jackson, because some of his fellow prisoners knew he was a "snitch." The district attorney notified Patillo's attorneys that Chatman was now claiming there had been a "deal," and they filed an

---

[2] The judge who presided over Patillo's trial was not the judge who revoked Chatman's probation.

extraordinary motion for new trial that was heard on August 11, 1987. Chatman and assistant district attorneys Odom and Adams testified at this hearing.

Chatman explained that the letters had been prompted by his fear for his life, and the truth was that, although he had sought from the state a promise to get his probation reinstated if he testified, the state had refused to make such a promise. However, the evidence shows that although the state was unwilling to promise that his probation would *be* reinstated, or even that the state would *recommend* that it should be reinstated, the two assistant district attorneys *did* agree that if Chatman testified they would tell the judge who had revoked Chatman's probation of Chatman's favorable testimony in the Patillo case, and, without making a recommendation one way or the other, would leave it to the judge whether or not to reinstate his probation. Chatman was warned that, in view of his record, his probation probably would not be reinstated.

Ultimately, the judge declined to reinstate Chatman's probation, but he did write a letter to the Department of Corrections, explaining Chatman's cooperation and assistance in the Patillo case, and asking for "consideration," specifically, that Chatman be allowed to serve his sentence at the Ware County Correctional Institute rather than in "the mainstream of the Georgia State Prison System, [where] his life would be in jeopardy." In accordance with this recommendation, Chatman finally was transferred to the Ware County facility, after he wrote his series of post-trial letters, but before he testified at the hearing on the extraordinary motion for new trial.

(c) The state argues that its agreement only to inform the judge of Chatman's cooperation, and not to make any recommendation of leniency, is not the kind of understanding or agreement that must be revealed under *Giglio*. The state relies on *McCleskey v. Kemp*, 753 F2d 877 (11th Cir. 1985), in which the 11th Circuit concluded that a police detective's statement to a witness that he would "speak a word" for him "offered such a marginal benefit . . . that it is doubtful it would motivate a reluctant witness, or that disclosure of the statement would have had any effect on his credibility." Id. at 884.

In this case, however, there was more than an offer by a police detective to "speak a word." Although the U. S. Supreme Court "has never provided definitive guidance on when the Government's dealings with a prospective witness so affect the witness' credibility that they must be disclosed at trial," ibid., we agree with the trial judge in this case who, after listening to the evidence, stated:

> It is reasonable for the defendant to contend that the jury and the Court were misled when Chatman testified that no deal had been offered him to get him to testify. Further, the

state should have revealed the agreement no matter how non-promising the agreement was in terms of its prospects for the witness.

Order Denying Defendant's Extraordinary Motion For New Trial, Record at p. 78.

However, a failure to disclose does not "automatically require a new trial. . . ." *Giglio*, supra, 405 U. S. at 154. Rather, reversal is required "only if the [undisclosed] evidence is material in the sense that its suppression undermines confidence in the outcome of the trial," i.e., "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, _____ U. S. _____ (105 SC 3375, 3381 and 3384, 87 LE2d 481) (1985).

If the agreement in this case had been disclosed, Chatman would still have been allowed to testify. The question of harm depends upon the likelihood that the disclosure of the agreement "would have affected the jury's assessment of [Chatman's] credibility." *McCleskey v. Kemp*, supra at 884. We agree with the trial court's evaluation of this issue:

[T]he prosecutors' failure to disclose . . . was harmless error in this case . . . for the following reasons:

(a) The agreement was of a non-promising nature;

(b) The witness was otherwise impeached by revelation of his own criminal record:

(c) The relevant facts testified to by the witness were corroborated by other credible testimony. . . .

(d) The witness' testimony in the end was motivated by factors other than the hope of leniency as a result of the representations made by the prosecutors;

(e) It is significant that the prosecutors told the witness what would not happen if he testified:

1. They would make no recommendations of leniency;

2. The witness should not expect to have his probation reinstated because of his bad record;

(f) The witness had no pending criminal case;

(g) No representations were made regarding possible parole

for the witness.

It is this Court's opinion that the jury in this case returned a verdict recommending the death penalty for the Defendant because of the brutal nature in which he murdered the victim and the post-murder statements the Defendant made in writing that showed an abandoned and malignant heart. In retrospect, the State would have been better served if [it] had not called David Chatman as a witness since he added nothing to the case, and his presence at trial and subsequent actions have only served to delay appropriate appellate review of Defendant's case. As this case graphically illustrates, a prisoner should not be called as a witness except in extreme circumstances. This was not one of those occasions.

Order Denying Defendant's Extraordinary Motion For New Trial, Record at p. 79-80. (Citations to the trial transcript omitted.)

5. Bombastic argument is not unconstitutional. *Spivey v. State*, 253 Ga. 187, 191 (4) (319 SE2d 420) (1984). A prosecutor is entitled to argue his case vigorously, so long as he talks about matters he is entitled to talk about. See *Conner v. State*, 251 Ga. 113 (5) (303 SE2d 266) (1983); *Walker v. State*, 254 Ga. 149 (14) (327 SE2d 475) (1985); *Brooks v. Kemp*, 762 F2d 1383, 1405 (11th Cir. 1985). Compare *Williams v. State*, 254 Ga. 508 (3) (330 SE2d 353) (1985). The defendant did not timely object to the state's closing argument, and having reviewed the record, as supplemented, we find no error. *Hicks v. State*, 256 Ga. 715 (23) (352 SE2d 762) (1987). Compare *Julius v. Johnson*, _____ F2d _____ (11th Cir. No. 86-7589, decided March 9, 1988).

### Sentence Review

6. The jury found the presence of two statutory aggravating circumstances: (1) "The offense of murder . . . was committed while the offender . . . was engaged in the commission of aggravated battery"; and (2) "The offense of murder . . . was outrageously and wantonly vile, horrible, and inhuman in that it involved depravity of mind and an aggravated battery to the victim. . . ." See OCGA §§ 17-10-30 (b) (2) and (b) (7).

The defendant contends that these findings are not supported by the evidence. We do not agree.

The defendant struck the victim at least 10 times with his baseball bat. Her hands were injured when she tried to ward off the blows; in fact, part of one finger was torn off from one of the blows and the missing piece, its fingernail still intact, was discovered a few feet from the body. She was struck on her forehead, her left eye, her mouth, her

right ear, and all over the back of her head. Her skull was fractured, and her scalp was separated from her skull. Death occurred "somewhere between . . . 5 and 30 minutes" after the attack, as a consequence of "subdural and subarachnoid hemorrhaging."

The evidence supports the jury's findings. OCGA § 17-10-35 (c) (2). Compare *Housel v. State,* 257 Ga. 115 (355 SE2d 651) (1987).

7. The defendant's death sentence was not imposed as a result of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1).

8. The sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). The similar cases listed in the Appendix support the imposition of a death penalty in this case.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 27, 1988.

*Alvin C. McDougald,* for appellant.

*Willis B. Sparks III, District Attorney, Virgil L. Adams, Assistant District Attorney, Michael J. Bowers, Attorney General, Eddie Snelling, Jr., Assistant Attorney General,* for appellee.

APPENDIX.

*Housel v. State,* 257 Ga. 115 (355 SE2d 651) (1987); *Hance v. State,* 254 Ga. 575 (332 SE2d 287) (1985); *Allen v. State,* 253 Ga. 390 (321 SE2d 710) (1984); *Finney v. State,* 253 Ga. 346 (320 SE2d 147) (1984); *Conner v. State,* 251 Ga. 113 (303 SE2d 266) (1983); *Williams v. State,* 250 Ga. 553 (300 SE2d 301) (1983); *Mathis v. State,* 249 Ga. 454 (291 SE2d 489) (1982); *Smith v. State,* 249 Ga. 228 (290 SE2d 43) (1982); *Cunningham v. State,* 248 Ga. 558 (284 SE2d 390) (1981); *Cervi v. State,* 248 Ga. 325 (282 SE2d 629) (1981); *Cape v. State,* 246 Ga. 520 (272 SE2d 487) (1980); *Young v. State,* 239 Ga. 53 (236 SE2d 1) (1977).