A92A1308. PARROTT v. THE STATE.
(427 SE2d 276)

SOGNIER, Chief Judge.

Alan Parrott was indicted together with Roosevelt Bray and Donald Ream on a charge of conspiracy to traffic in cocaine in violation of OCGA § 16-13-33. Parrott was tried separately and convicted by a Dodge County jury. He appeals from the denial of his motion for new trial.

1. Appellant contends the evidence was insufficient to support the verdict. The evidence adduced at trial established that in 1984-1986 appellant, who previously had pleaded guilty to drug conspiracy charges in Florida, and his codefendants were placed under surveillance by Florida and U. S. Customs authorities on suspicion of drug smuggling. Evidence was adduced connecting the three men to a Cessna 310 twin-engine aircraft (the "Cessna") stored at a hangar at Ft. Lauderdale Executive Airport. Pursuant to a court order, federal officials installed a tracking device in the Cessna. During this installation, authorities observed that the Cessna had been modified to add supplemental fuel tanks to increase its flight range. The tracking device subsequently recorded several flights to the Eastman-Dodge County Airport in Georgia where Bray recently had paid cash for a nearby house and two parcels of land.

In February 1985 the Cessna was detected flying low over the Florida coast without having filed a flight plan, which officials explained at trial is consistent with the activities of drug smugglers. Customs officials followed the Cessna in a Customs airplane but were forced to abandon the chase when the Cessna turned out to sea several hours later. On June 10, 1985, the Cessna was detected flying over the Gulf of Mexico near Texas. Again, Customs airplanes tracked the Cessna, flying over Mississippi, Alabama, and Georgia. The Cessna approached the Dodge County airport but then aborted the landing, apparently because the pilot observed the Customs aircraft. The Cessna continued to South Carolina, where parcels were dropped from the plane. The Customs aircraft was forced to discontinue its pursuit due to low fuel, and the Cessna was found abandoned at the Dodge County airport an hour later. Appellant and Bray were seen at an attorney's office in Eastman the next morning. The parcels dropped from the Cessna were located in South Carolina and were found to contain 150 pounds of South American cocaine with a purity of at least 80 percent.

Additional evidence was adduced that Ream was a pilot and that the Cessna was registered to a corporation he controlled; that a warehouse in Florida connected to appellant and the codefendants was searched and found to contain weapons, records of the criminal enterprise, and aircraft equipment, including the passenger seats removed from the Cessna; that documents prepared by appellant were found in a search of Bray's Dodge County home the day after the Cessna was abandoned; and that appellant and Ream met with Lazaro Fernandez, an admitted smuggler of Colombian cocaine, to discuss a joint drug smuggling enterprise but later informed Fernandez they could not complete the transaction because they had been forced to abandon their Cessna 310 aircraft after pursuit by law enforcement officials and their warehouse had been searched by authorities. Appellant

was arrested in Ft. Lauderdale in July 1986 after a high-speed chase.

" 'Conspiracy consists in a corrupt agreement between two or more persons to do an unlawful act, the existence of which agreement may be established by direct proof, or by inference, as a deduction from acts and conduct, which discloses a common design on their part to act together for the accomplishment of the unlawful purpose.' [Cit.] ' . . . "Slight evidence from an extraneous source [other than an accomplice] identifying the accused as a participator in the criminal act will be sufficient corroboration of the accomplice to support a verdict." ' [Cit.]" *Tookes v. State*, 159 Ga. App. 423, 427 (8) (283 SE2d 642) (1981). Circumstantial evidence was adduced from which the jury could conclude that appellant committed one or more overt acts in furtherance of a conspiracy with Ream and Bray to bring large quantities of cocaine into Georgia. We hold this evidence was sufficient to authorize a rational trier of fact to conclude beyond a reasonable doubt that appellant was guilty of conspiring to traffic cocaine in Georgia. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Appellant next contends the trial court erred by denying his motion for mistrial made after Nathan Platt, a witness called by the State, invoked his Fifth Amendment right against self-incrimination. Both the prosecutor and appellant's counsel previously had been informed by Platt that he would claim Fifth Amendment protection if necessary. Indeed, appellant's counsel had lunch with Platt the day before his testimony and also talked with Platt's attorney about Platt's intentions but did not request a hearing on the issue prior to Platt's testimony.

On direct examination, Platt testified at length about his prior contacts with appellant and Bray in Florida when Platt was a deputy sheriff. In response to the prosecutor's questions, Platt admitted having given a statement to Florida authorities about his involvement with appellant and Bray but invoked the Fifth Amendment when asked to disclose the contents of that statement. The court then dismissed the jury and conducted a thorough examination of Platt's claim of privilege, questioning Platt himself and also allowing appellant's counsel to cross-examine on this issue. The court concluded that Platt was entitled to assert the privilege, and the prosecutor conceded and stated he would not question Platt further. At that point, appellant moved for a mistrial and the court denied the motion. Appellant then cross-examined Platt, but only on the topic for which he continued to assert his Fifth Amendment protection (although appellant's counsel did elicit testimony from Platt that his statement in question had been false).

Appellant contends the effect of this incident was to deny his Sixth Amendment right to confront the witnesses against him. To

safeguard the right of confrontation, the procedure to be observed when the State calls a witness who has indicated he intends to assert his Fifth Amendment right against self-incrimination, as articulated in *Lingerfelt v. State*, 235 Ga. 139 (218 SE2d 752) (1975) and *Lawrence v. State*, 257 Ga. 423, 424-425 (3) (360 SE2d 716) (1987) and applied in *Greenwood v. State*, 203 Ga. App. 901-902 (1) (418 SE2d 160) (1992), is as follows: When the witness manifests his intention to claim Fifth Amendment protection, the court must conduct a hearing outside the presence of the jury to determine whether the testimony the State seeks to elicit potentially could incriminate the witness. *Lawrence*, supra at 424 & n. 3. If so, the question whether the testimony might incriminate the witness is left to the witness. Id.; *Mallin v. Mallin*, 227 Ga. 833, 834-835 (1) (183 SE2d 377) (1971). If the witness concludes he must assert his Fifth Amendment privilege, the State will not be permitted, through the use of leading questions on topics the witness has indicated fall within the privilege, to suggest the guilt or complicity of the defendant. *Greenwood*, supra; *Lawrence*, supra at 424-425 & n. 3; *Lingerfelt*, supra. Conversely, if during the hearing the court concludes the testimony could not incriminate the witness, the witness must testify. *Lawrence*, supra at 424, n. 3.

When the sequence of events is viewed in its entirety, the record clearly demonstrates that no violation of appellant's Sixth Amendment right of confrontation occurred. First, the trial court *did* follow the procedure set forth in *Lawrence* and *Lingerfelt*. Once Platt asserted the privilege, the court held the requisite hearing and concluded Platt was entitled to claim Fifth Amendment protection, and the State ceased its questioning. See generally *Bowen v. State*, 194 Ga. App. 80, 81-82 (2) (389 SE2d 516) (1989). Second, in *Lingerfelt* and its progeny the error harmful to the defendant occurred when the prosecutor continued to ask leading questions he knew the witness would not answer but that implicated the defendant in wrongdoing. Contrary to the dissent's contentions, that error did not occur here because the evidence damaging to appellant was adduced through questions Platt *did* answer, not through leading or suggestive questions posed by the prosecutor to which Platt asserted the Fifth Amendment as a defense. Third, appellant could have cross-examined Platt on the damaging portions of his testimony, but he elected instead to pursue questioning only on the one point for which Platt had asserted Fifth Amendment protection.

Perhaps the better approach would have been to hold the hearing before Platt's testimony began and establish parameters for questioning in advance. However, we do not find the failure to follow such a procedure to be cause for reversal here because, in addition to the fact that the error the hearing procedure is intended to avoid did not occur here, the record unequivocally shows that appellant's knowl-

edge of Platt's intentions was at least equal to the State's knowledge, yet appellant did not request a hearing in advance or otherwise raise the issue until after Platt had asserted his claim and the court had conducted the requisite hearing. Appellant cannot be permitted to complain of a ruling that his own conduct aided in causing. *Dobbs v. State*, 200 Ga. App. 300, 301 (407 SE2d 782) (1991). Under these circumstances, we find no reversible error. See generally *Bowen*, supra.

3. Prior to trial, appellant moved the court to compel the State to reveal any deal made with prosecution witnesses as required by *Giglio v. United States*, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972). At the motion hearing, the prosecutor denied that any deals had been struck with prospective witnesses but stated that after the trial he would, if requested by any witness, write a letter to appropriate authorities outlining the witness's participation in the trial. One month after appellant was convicted, the prosecutor did write to Florida authorities to describe the cooperation of Lazaro Fernandez, a witness incarcerated in the Florida penal system. During the hearing on the motion for new trial, the prosecutor explained that he had written the letter in response to a post-trial request from Fernandez.

Even assuming, without deciding, that the record contains some evidence that the prosecution held out the promise of such a letter *before* appellant's trial, and assuming further that such an offer constituted the type of agreement that is required to be revealed, see *Patillo v. State*, 258 Ga. 255, 260-261 (368 SE2d 493) (1988), we find no harmful error. The alleged offer "was of a non-promising nature," see id. at 261; Fernandez was impeached at trial; other witnesses provided corroborative testimony; and the State was not in a position to make any promises of leniency or parole to Fernandez because he was not incarcerated or charged in Georgia. See id. at 261-262. Thus, there is no reasonable probability that disclosure of the alleged offer would have affected the results of the jury's deliberations. See *Bradley v. State*, 193 Ga. App. 515, 516 (2) (388 SE2d 331) (1989).

4. Appellant maintains the trial court erred by failing to dismiss the indictment once appellant was not tried within 180 days of his demand for trial under the Interstate Agreement on Detainers, OCGA § 42-6-20 ("IAD"). The pertinent portion of the IAD provides that whenever a person incarcerated in one state is indicted in another state, "he shall be brought to trial [in the latter state] within [180] days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of . . . his request for a final disposition to be made of the indictment . . . provided that for good cause shown in open court, the prisoner or his counsel being present, the [trial court] may grant any necessary or reasonable continuance. The request of the prisoner shall be accompanied by the certificate of the appropriate official hav-

ing custody of the prisoner, stating [specified information]." Id. at Article III (a). This written notice and request "shall be given or sent by the prisoner to the . . . official having custody of him, who shall promptly forward it together with the certificate to the appropriate prosecuting official and court." Id. at Article III (b).

At the time appellant was indicted in Dodge County, Georgia (April 19, 1989), he was imprisoned in Florida. The record reveals that on August 17, 1989, the Florida Department of Corrections forwarded the requisite IAD forms from appellant to the Dodge County District Attorney. However, the Florida officials sent the court copies to the Oconee County Superior Court instead of to the Dodge County Superior Court in the Oconee Judicial Circuit where the indictment was pending. The IAD request was not filed in Dodge County Superior Court until February 14, 1990. Nonetheless, on January 18, 1990, the District Attorney returned to Florida authorities the completed IAD forms, which included the signature of the Dodge County Superior Court judge to whom the case was assigned. On February 12, 1990, the State moved for an extension of time under the IAD because it had been unable to locate appellant's codefendant Ream. The court granted this motion in open court and subsequently set the trial on the June 4, 1990 calendar. Appellant's trial began July 30, 1990, more than 180 days after the IAD request was sent to the District Attorney but only 166 days after the request was filed in the proper court.

We hold that under the circumstances of this case, the rationale advanced in *Thompson v. State*, 186 Ga. App. 379 (367 SE2d 247) (1988) controls. Here, as in *Thompson*, appellant was tried within 180 days after the requisite documents were filed with all entities required by the statute. Although the initial failure to forward the IAD demand to the proper court was the result of a mistake by Florida authorities, not by appellant, "Georgia's right to try an accused for a crime committed within its borders should not be imperiled or compromised by a delay occasioned not by its own inaction or negligence, but by the inadvertent or deliberate failure to act of those having custody of the accused in another state." Id. at 380. Moreover, even assuming, without deciding, that the signature of the Dodge County Superior Court judge on the forms returned to Florida on January 18, 1990 shows that the proper court had timely actual notice of appellant's IAD demand and that such notice is sufficient to invoke the coverage of the IAD, the State timely moved for a continuance in order to locate a potential material witness, and appellant has failed to show that the grant of this continuance was not "necessary or reasonable" under OCGA § 42-6-20 Article III (a). Accordingly, we hold the trial court did not err by refusing to dismiss the indictment. See generally *Thompson*, supra at 380-381.

5. Appellant maintains the trial court improperly admitted evidence of prior criminal transactions.

(a) Over appellant's objection, the State was permitted to introduce a certified copy of a Florida indictment and judgment showing that in 1982 appellant pleaded guilty to charges of conspiracy to traffic in cocaine and marijuana. Appellant contends that under *Williams v. State*, 261 Ga. 640, 642-643 (c-d) (409 SE2d 649) (1991), submission of the indictment was insufficient to establish the requisite similarity between the Florida offense and the instant charge. We disagree, as the indictment alleged the charged conspiracy in great detail, and alleged particularly that appellant conspired with others to smuggle into the United States by private aircraft large quantities of contraband. Appellant having admitted the facts set forth in the indictment by pleading guilty, *Wilson v. Reed*, 246 Ga. 743 (1) (272 SE2d 699) (1980), the State sufficiently established the similarity of the offenses. See *Johnson v. State*, 204 Ga. App. 453 (419 SE2d 741) (1992); *Banks v. State*, 201 Ga. App. 266, 268 (410 SE2d 818) (1991).

(b) Appellant waived his objection to the admission of the similar transactions listed in sections (C)-(F), (H) of his enumeration by failing to assert at trial his specific objections to the evidence at the time it was offered. *Hunter v. State*, 202 Ga. App. 195, 196-197 (3) (413 SE2d 526) (1991).

(c) The trial court sustained appellant's objection to the State's proffer of evidence appellant entered a plea of nolo contendere to a Florida drug trafficking charge. However, a copy of the plea was attached to another State's exhibit that was admitted into evidence. We agree with appellant that OCGA § 17-7-95 (c) prohibits the admission of a nolo contendere plea as evidence of a prior similar crime. *Corbitt v. State*, 190 Ga. App. 509 (1) (379 SE2d 535) (1989). Nonetheless, given that evidence of five other similar transactions was properly submitted to the jury, applying the standard for harmless error set forth in *Johnson v. State*, 238 Ga. 59, 61 (230 SE2d 869) (1976), we find it highly probable that this error did not contribute to the judgment of conviction. See *Hendrix v. State*, 202 Ga. App. 54, 55 (3) (413 SE2d 232) (1991).

6. Appellant next enumerates as error the trial court's decision to allow an attorney, McMillan Walker, and his secretary to testify that appellant and Bray met with Walker in his Eastman office the day after the Cessna was found abandoned in Dodge County. It is undisputed that appellant did not engage Walker to represent him as a result of this meeting, and the evidence is in conflict as to whether appellant even considered or discussed such representation. Nonetheless, even assuming, without deciding, that appellant and Walker did communicate "pending" or "in anticipation" of employment of Walker by appellant, see OCGA § 24-9-24, we find no error. The fact

of employment is not within the attorney-client privilege, *Cranford v. Cranford*, 120 Ga. App. 470, 473 (2) (170 SE2d 844) (1969), and the trial court excluded all evidence beyond the mere fact that the meeting between appellant and Walker occurred. See OCGA § 24-9-24 (prohibits disclosure of "communications" between attorney and client). Appellant's remaining arguments concerning this enumeration were not raised below and accordingly cannot be considered on appeal. See *Johnson v. State*, 198 Ga. App. 316 (3) (401 SE2d 331) (1991).

7. After the State produced exculpatory evidence in response to appellant's *Brady* motion (*Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963)), appellant requested that the court conduct an in-camera inspection. The trial judge indicated he did not conduct such inspections until just before trial. Appellant later renewed his request and raised the issue again at the beginning of the trial, but his request was rejected by the judge who had subsequently been appointed to try the case.

Under the Supreme Court's holding in *Tribble v. State*, 248 Ga. 274 (280 SE2d 352) (1981), after the State had made its response to the *Brady* motion the trial court was obliged to conduct an in-camera inspection once appellant so requested. The Supreme Court subsequently held in *Carpenter v. State*, 252 Ga. 79, 81-82 (310 SE2d 912) (1984) that a trial court's failure to comply with the request does not automatically require reversal. Instead, the trial court may conduct a post-conviction review of the material in the State's file. Id. Accordingly, we remand this case with direction that such an inspection be made. Accord *Atkins v. State*, 254 Ga. 641, 642 (331 SE2d 597) (1985).

8. We have reviewed appellant's remaining enumerations and arguments and have found them to be without merit.

*Judgment affirmed and case remanded with direction. Birdsong, P. J., Beasley, Andrews and Johnson, JJ., concur. Carley, P. J., concurs in Divisions 1, 2, 3, 4, 5, 7, 8, and in the judgment. McMurray, P. J., Pope and Cooper, JJ., dissent.*

McMURRAY, Presiding Judge, dissenting.

I respectfully dissent as it is my view that improper submission to the jury of defendant's plea of nolo contendere to a charge of trafficking in cannabis requires reversal under the binding authority of *Abbott v. State*, 24 Ga. App. 367 (100 SE 759). Further, I do not agree with the majority's holding that the jury's consideration of defendant's nolo contendere plea was harmless error under the "highly probable that the error did not contribute to the judgment" test enunciated in *Johnson v. State*, 238 Ga. 59, 61 (230 SE2d 869). It is also my view that the State's calling of Nathan Buddy Platt, Jr. as a witness,

with full knowledge that Platt intended to invoke his Fifth Amendment right to remain silent, impaired defendant's Sixth Amendment right of confrontation in violation of the Supreme Court's directives in *Lingerfelt v. State*, 235 Ga. 139 (218 SE2d 752), and *Lawrence v. State*, 257 Ga. 423 (360 SE2d 716). Consequently, defendant should be granted a new trial.

1. The State attempted to prove that defendant committed a crime in the State of Florida similar to the crime charged in the case sub judice by offering a judgment and sentence showing that defendant entered a nolo contendere plea in the State of Florida for the offense of trafficking in cannabis. Defense counsel objected, arguing that the nolo contendere plea is not admissible to prove a prior similar crime. The trial court properly excluded the nolo contendere plea from evidence. OCGA § 17-7-95; *Corbitt v. State*, 190 Ga. App. 509 (1) (379 SE2d 535). However, the nolo contendere plea was improperly included with a "State's Exhibit" that was admitted into evidence and considered by the jury.

"Where in a criminal case a letter of such a character as to prejudice the minds of the jurors against the defendant has been excluded from the evidence, and by inadvertence is handed by the solicitor-general to the jury with the documentary evidence in the case, and remains with the jury until their verdict is returned, the presumption is that the jurors read it before arriving at their verdict, and that the defendant's cause was prejudiced thereby. If all of the jurors testify that they did not read the letter before arriving at their verdict, the presumption is rebutted and a new trial is not required. Where, however, it is not so testified by all of the jurors, the presumption remains and a new trial becomes necessary. This is true even though all the members of the jury testify that the letter did not influence their verdict." *Abbott v. State*, 24 Ga. App. 367 (3), supra.

In the case sub judice, there is no dispute that defendant's nolo contendere plea was excluded from evidence by the trial court; that the nolo contendere plea was included with a "State's Exhibit" which was submitted to the jury and that consideration of the nolo contendere plea by the jury unfairly placed defendant's character in issue. OCGA § 17-7-95; *Corbitt v. State*, 190 Ga. App. 509 (1), supra. Further, there is no proof that jurors did not examine the nolo contendere plea before reaching a verdict. Consequently, the presumption of harm remains and a new trial is required under the standard set in *Abbott v. State*, 24 Ga. App. 367 (3), supra. Compare *City of East Point v. Christian*, 41 Ga. App. 536 (2) (153 SE 784), and *Morris v. Ga. Power Co.*, 133 Ga. App. 911 (1) (213 SE2d 66). Nonetheless, the majority holds that admission of the nolo contendere plea is harmless.

In *Johnson v. State*, supra, the Supreme Court considered

whether injection of prejudicial matters not in evidence constituted harmful error and adopted what "is known as the 'highly probable test,' i.e., that it is 'highly probable that the error did not contribute to the judgment.' Traynor, What Makes Error Harmless, The Riddle of Harmless Error (1970)." *Johnson v. State*, 238 Ga. 59, 61, supra. In applying this test, the Supreme Court considered the degree of evidence presented at trial and the magnitude of harm resulting from admission of evidence outside the record and determined that it was not possible to say "that it is highly probable that the error did not contribute to the jury's verdict." *Johnson v. State*, 238 Ga. 59, 61, supra.

In the case sub judice, the majority concedes that consideration of the Florida nolo contendere plea by the jury improperly placed defendant's character in issue but they fail to compare any harm resulting from this error to the degree of evidence presented at trial. Instead, the majority holds that admission of other similar transaction evidence renders the improperly injected evidence harmless. I cannot adopt this standard as it is my view that the "highly probable test" requires an exercise of discretion in considering the magnitude of harm to the degree of evidence presented at trial.[1] It is from this perspective that I view consideration of defendant's nolo contendere plea by the jury as reversible error. OCGA § 17-7-95; *Corbitt v. State*, 190 Ga. App. 509 (1), supra.

In the case sub judice, defendant's conviction was based entirely on circumstantial evidence. Specifically, there is no direct evidence linking defendant to a conspiracy to smuggle drugs into Dodge County, Georgia; there is no direct evidence placing defendant in the aircraft that was allegedly used to smuggle cocaine into Dodge County, Georgia, and there is nothing linking defendant to the contraband that was ejected from the abandoned Cessna aircraft. In fact, my examination of the record reveals that the State's case was based largely on similar transaction evidence, much of which was substantiated by inadmissible hearsay. Under these circumstances, I cannot say "that it is highly probable that the error did not contribute to the jury's verdict." *Johnson v. State*, 238 Ga. 59, 61, supra.

---

[1] " "The *highly probable* test avoids the evils of inadequate or excessive stringency by making affirmance conditional on high probability that error did not affect the judgment. The test compels a judge to go beyond a first glance for affirmance or a fleeting glimpse for reversal. It compels him to exercise his mind in the exercise of his discretion, to go beyond the appearances of the result to an examination of what causal links there may be between error and the judgment. It keeps judicial discretion within the ample bounds of reason. It can greatly improve the net worth of the judicial process as it thus holds down excesses either of affirmance that recklessly dampens assurance of a fair day in court or of reversal that needlessly calls for still another fair day at the expense of litigants who are still awaiting their first day in court.' Id. at pp. 50-51." *Johnson v. State*, 238 Ga. 59, 61, supra.

2. In his fifth enumeration, defendant contends the trial court erred in failing to grant his motion for mistrial after "the invocation of Fifth Amendment privilege in the presence of the jury by an alleged co-conspirator." Defendant argues that the procedure employed by the State's attorney in questioning the witness implicated him in criminal activity in Florida and that he was unable to challenge this testimony on cross-examination because the witness invoked the Fifth Amendment.

The State called Nathan Buddy Platt, Jr. with full knowledge that the witness intended to invoke his Fifth Amendment right to remain silent with regard to a statement given to Florida law enforcement officers. Mr. Platt testified, in pertinent part, as follows: "[State's Attorney]. Do you know [defendant] Alan Parrott? A. To a degree. Q. Okay, How long have you known him? A. Four, maybe five, years. Q. Okay. And, do you know anybody known to you as 'Bree'? A. I've heard of him. Q. All right. Is that [co-defendant] Roosevelt Bray? A. It's a possibility. Q. Well, is it or isn't it? A. Yes. Q. Okay. And, you've seen 'Bree' up here in the last two days you've been up here, what yesterday and today? A. Outside the courtroom. Q. Yes, sir. You know [defendant Parrott's attorney] Mr. McLarty here? A. Yes. Q. All right. You ate lunch with him yesterday, I believe, didn't you? A. Yes. . . . Q. Okay. Do you reside . . . in Glades County, Florida? A. Yes, sir. . . . Q. And have you ever seen [defendant] Parrott in Glades County, Florida? A. Yes. Q. Okay. And [co-defendant] Roosevelt Bray, known as 'Bree,' have you ever seen him in Glades County, Florida? A. Yes. Q. And all of this would have been how long ago, roughly, that you saw these people in Glades County, Florida? A. Four years, maybe more or less. I don't remember. Q. Would it have been around 1985, '86? A. It could have, yes. Q. All right. Was it or was it not? A. Yes. Q. Have you ever talked with [defendant] Parrott? A. About what? Q. Well, about anything? A. Yes. We've been fishing together on Lake Okeechobee. Q. Okay. Is that the only thing you've done with Mr. Parrott? A. I don't really know how to answer you. Q. Do you know — Let me put it this way. Other things, have you ever been around Mr. Parrott when Mr. Herman Bray and [co-defendant] Roosevelt Bray were also there? A. Yes. Q. Okay. And how about an individual by the name of — a Cuban by the name of Lazaro Fernandez? A. I wouldn't know him if he was in here. Q. You never dealt with Mr. Fernandez? A. No. Q. Okay. You have dealt with Mr. Parrott? A. Yes. Q. Okay. Do you know where an Indian reservation is in Glades County, Florida? A. Yes, I live about six, maybe seven miles from it. Q. Okay. And, is there — Is one of your brothers or was one of your brothers a caretaker of sort of a ranch right next to the Indian reservation? A. Yes. Q. All right. Which brother was that? A. Richard. Q. Okay. And was he in that capacity back around 1985, '86? A. Yes.

Q. And, have you see[n] Mr. Parrott and 'Bree' and Herman Bray and all them on that property? A. Yes. Q. Okay. Do you recall — Do you know Mr. Tommy Herne? A. Yes. Q. Okay. Who is Mr. Herne? A. Back then he was a chief investigator for the Glades County Sheriff's Department. Q. Okay. And what was your capacity? Were you employed back then? A. Yes. Q. All right. What were you? A. I was a deputy sheriff's correctional officer in Okeechobee County in 1986. Q. All right. So, you were a law enforcement officer at this time? A. Yes. Q. Okay. And do you know Mr. John King of the Florida Division of Law Enforcement? A. Yes. Q. When did you first meet Mr. King? A. In '86, maybe '87. I don't remember for sure. Q. Okay. And, was that about the time that your employment terminated with the sheriff's department down there? A. Yes, sir. Q. Okay. Do you know Gus 'Pops' Ross? A. No. Q. You don't know him? How about 'Beeboo' Wambole? A. No. Q. Okay. Just [defendant] Parrott, [co-defendant] 'Bree' and Herman? A. Yes. Q. Okay. Have you ever known or seen a Colombian by the name of Carlos? A. No. Q. Okay. You've never seen anybody by that name? A. No, sir. Q. But you knew his name? A. I knew his name, but I never seen him. Q. You've heard the name Carlos? A. Yes. Q. Where did you hear that name? A. In the conversations. Q. With [defendant] Parrott? A. Yeah. Q. Okay. Was this about the same time ya'll were in or about this property that your brother was the overseer? A. Yes. Q. Okay. In the latter part of 1986 did you give a statement to Mr. Tommy Herne, who was the Chief Deputy for what, Glades County? A. Glades County. Q. All right. Now, you knew Mr. Herne for a long time, right? A. Yes. Q. And, I assume — How long had you known Mr. King? A. I just met him in '86. Q. Okay. All right. Did you give a statement to them about your involvement with [defendant] Parrott and the — Herman [Bray] and [co-defendant] Roosevelt Bray? A. Yes. Q. And, did you — What was the content of that statement, please sir? A. I'm sorry. On the advice of counsel I decline to answer on the grounds that it may tend to incriminate me and I assert my freedom from self-incrimination as protected by the Constitution of the U.S.A., the State of Florida and the State of Georgia. . . .

"[DEFENSE COUNSEL]: Your Honor, I'd like the jury excused. I'd like to make a motion. THE COURT: Let's let this develop just a little bit more. [DEFENSE COUNSEL]: Okay. [STATE'S ATTORNEY]: Did you come up here voluntarily, Mr. Platt? A. No. Q. Were you ordered to come to court? A. Yes. Q. And you hired an attorney to — A. To try to stop it. Q. — keep you from coming up here? For what reason do you feel that this statement might incriminate you that you have given? [DEFENSE COUNSEL]: Objection, Your Honor." The trial court then excused the jury, conducted a hearing to determine the basis of Mr. Platt's decision to remain silent and in-

formed the State's attorney that the witness appears to have cause for invoking the Fifth Amendment right against self-incrimination. The State's attorney responded: "We won't pursue the matter, Your Honor. . . . We've gotten the information we need from this witness." Defense counsel then moved for a mistrial, arguing that "where the State knows that an individual [is going to] invoke his Fifth Amendment rights in the presence of the jury that it is prejudicial to bring that witness before the jury without having a hearing outside the presence of the jury. . . ." The trial court recognized that "the problems you get into when the privilege is asserted is a limitation that places on the opposite side of a full and thorough cross examination[,]" but found that the State's attorney did not act in "bad faith" and denied defendant's motion for mistrial.

The jury was recalled and defense counsel cross-examined Mr. Platt as to the substance of the statement he gave to the Florida law enforcement officers. The trial court then admonished the witness that if he answered any questions regarding the statement that it would constitute a waiver of his right against self-incrimination. Mr. Platt decided not to waive his Fifth Amendment right and did not answer defense counsel's questions concerning the statement. He only affirmed that the statement he gave the Florida law enforcement officers was not true.

In *Lingerfelt v. State*, 235 Ga. 139, supra, and *Lawrence v. State*, 257 Ga. 423, supra, "the trial court permitted the State to call a witness who had notified the court and counsel that he would not answer any question and ask leading questions, predicated on the witness' prior statements, which suggested the defendant's guilt of the crimes charged. Under the circumstances of those cases, the procedure whereby the prosecutor was allowed, in effect, to testify for the witness and circumvent meaningful cross-examination as to obvious inferences was soundly condemned. See *Lawrence* at p. 425 (fn. 3)." *Greenwood v. State*, 203 Ga. App. 901 (1), 902 (418 SE2d 160).

In the case sub judice, it is obvious that the State's questioning of Mr. Platt (with full knowledge that the witness intended to invoke the Fifth Amendment) created an unfavorable inference that defendant was involved with Mr. Platt and others in criminal activities in Florida and that the harmful inference went virtually unchallenged because the witness invoked the Fifth Amendment. It is my view that this procedure is essentially the same as the procedures condemned in *Lingerfelt* and *Lawrence* and that the trial court therefore erred in denying defendant's motion for mistrial, i.e., defendant was denied fair access to a witness on cross-examination for purposes of challenging unfavorable inferences projected by the State on direct examination. *Greenwood v. State*, 203 Ga. App. 901 (1), supra.

Pope, Judge, dissenting.

I dissent to Division 2 of the majority opinion. The majority finds no reversible error here in part because the witness did answer certain questions prior to invoking his Fifth Amendment privilege and, according to the majority, it was only the answers to those prior questions which were incriminating to the defendant. While it is true that the witness' answers to some of the questions concerning his relationship with the defendant raised an inference concerning the defendant's involvement in criminal activities, I believe the most damaging aspect of the witness' testimony was his acknowledgement that he had given an incriminating statement to Florida authorities and his subsequent refusal to answer questions about the contents of that statement. Thus I think it matters little whether the defendant could have confronted the witness about other aspects of his testimony as the defendant could not confront the witness about the most damaging aspect of his testimony.

I also disagree that defendant invited the error here. The State knew of the witness' intention not to testify about the incriminating statement, and it was incumbent upon the State, the party calling the witness, to request a hearing at the outset of the testimony, or at a minimum, to request a hearing before the question was asked which the State knew would cause the witness to invoke the privilege.

As I read the majority, reversible error occurs only if the State does *exactly* what the prosecutor did in *Lingerfelt v. State*, 235 Ga. 139 (218 SE2d 752) (1975). Such a rote application of precedent ignores the underlying rationale in that case and allows the State to circumvent the procedure established pursuant to *Lingerfelt* and its progeny. In my opinion, defendant's motion for mistrial should have been granted.

DECIDED DECEMBER 4, 1992 —
RECONSIDERATION DENIED DECEMBER 17, 1992

*Hackel & Hackel, Thomas M. Hackel, Harrison, Harrison & Llop, Steven M. Harrison*, for appellant.

*James L. Wiggins, District Attorney, Russell P. Spivey, Assistant District Attorney*, for appellee.