S95A1096. McINTYRE v. THE STATE.
(463 SE2d 476)

CARLEY, Justice.

Robert McIntyre was tried before a jury and found guilty of murder. He appeals from the judgment of conviction and life sentence entered by the trial court on the jury's guilty verdict.[1]

1. When the evidence is construed most strongly in favor of the State and against McIntyre, the jury was authorized to find the following: McIntyre became a member of a satanic group of which Terry Chapman was the leader. Malisa Earnest and the victim were runaways who were given shelter by Chapman. The victim rejected McIntyre's sexual advances. Subsequently, McIntyre, Chapman and Ear-

---

[1] The murder was committed on January 17, 1988 and McIntyre was indicted on March 1, 1988. The guilty verdict was returned on June 10, 1988 and, on that same date, the judgment of conviction and sentence was entered thereon. The motion for new trial was filed on July 6, 1988 and denied on June 11, 1993. McIntyre's motion for an out-of-time appeal was granted on January 4, 1995. The notice of appeal was filed on January 12, 1995 and the case was docketed in this Court on April 7, 1995. Oral argument was heard on June 26, 1995.

nest discussed killing the victim and agreed to strangle her with the lace from a boot. Earnest put the lace around the victim's neck and, when she began to struggle, Chapman took the lace and tightened it. McIntyre then took the lace and, placing his knee to the victim's back, tightened it around her neck. McIntyre and Chapman tied a double knot in the lace and sat on either side of the victim's body. Holding hands, they recited a satanic chant. After wrapping the body in a blanket, they buried it in the nearby woods. The next day, McIntyre took his mother's van and he, along with Chapman and Earnest, fled the state. McIntyre's parents reported that he and the van were missing. An officer in Louisiana stopped the van after determining that it was reported as stolen and the occupants were reported as missing juveniles. The Georgia authorities were contacted and they requested that McIntyre and Chapman be detained as runaways in possession of a stolen vehicle. After receiving *Miranda* warnings, McIntyre and Chapman were placed in a cell. Although Earnest was not detained, she was, at her request, allowed to stay in a cell near that which housed McIntyre and Chapman. During the night, Earnest volunteered to her cellmate that she and McIntyre and Chapman had committed a murder. In the hearing of Earnest's cellmate, the three then openly discussed the murder and the burial of the victim's body. The next morning, Earnest left for Georgia by bus and McIntyre and Chapman were taken before the juvenile court where they gave their consent to be returned to Georgia. Meanwhile, Earnest's cellmate reported to the Louisiana authorities the admissions which she heard regarding the murder. The Georgia authorities were contacted and the victim's body was discovered. When McIntyre and Chapman arrived in Georgia, they were taken into custody. McIntyre was advised of the murder charge and given his *Miranda* warnings. He made no statement to the officers but, when his mother arrived, he made a statement to her in the presence of the sheriff. In this statement, McIntyre admitted to his mother that he "tied the knot off." Chapman and Earnest were tried and convicted. *Chapman v. State*, 259 Ga. 592 (385 SE2d 661) (1989); *Earnest v. State*, 262 Ga. 494 (422 SE2d 188) (1992). Chapman testified for the State and his testimony was corroborated in several material respects. McIntyre presented no evidence in his defense.

This evidence was sufficient to authorize a rational trier of fact to find proof of McIntyre's guilt of murder beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. During the trial, Judge Robert Noland initially presided, but had to leave during the State's presentation of evidence in order to attend the funeral of his infant grandson. Judge Robert James replaced Judge Noland over McIntyre's objection. McIntyre contends that the substitution of judges constituted a violation of his Sixth and

Fourteenth Amendment rights. We assume, for purposes of this appeal only, that these rights are implicated by a midtrial substitution of judges. But see *People v. Espinoza*, 12 Cal. Rptr. 2d 682, 695 (1992).

It is the general rule that any error in the substitution of judges is subject to harmless error analysis. *Jimenez v. State*, 838 SW2d 661, 666 (Tex. App. 1992); *United States v. Boswell*, 565 F2d 1338, 1342 (5th Cir. 1978); Annot., 73 ALR Fed. 833, 839, § 4; 75 AmJur2d 444, Trial, § 222. The dissent has cited no authority for the proposition that certain substitutions of judges are "structural defects" which require automatic reversal. Indeed, many of the cases cited by the dissent have expressly recognized the possibility of harmless error. One of those cases was decided since *Arizona v. Fulminante*, 499 U. S. 279 (111 SC 1246, 113 LE2d 302) (1991) and dealt with a midtrial substitution of judges. *Hood v. State*, 637 A2d 1208, 1213, 1214 (Md. 1994). Although *Hood* held that the State must rebut a presumption of prejudice or demonstrate beyond a reasonable doubt that the error was harmless, it also recognized "that a number of courts have held to the contrary, and have required that a defendant demonstrate actual prejudice in order to obtain a new trial. . . ." *Hood v. State*, supra at 1213.

Similarly, in Georgia, the temporary absence of a trial judge without suspension of the trial is not a basis for reversal unless the complaining party shows prejudice resulting from the absence. *Koza v. State*, 158 Ga. App. 709, 710 (4) (282 SE2d 131) (1981). McIntyre has not shown that he was harmed by the substitution, and therefore, under the circumstances of this case, the procedure followed in the trial court does not require reversal of the judgment of conviction. *Jimenez v. State*, supra at 666.

3. McIntyre urges that the statement that he made to his mother should have been suppressed as the product of an illegal arrest and impermissible interrogation. However, once the officer in Louisiana determined that the van was reported as stolen and its occupants reported as runaways, he had probable cause to stop the van and arrest its occupants. After his lawful arrest in Louisiana, McIntyre gave valid consent to his return to Georgia in accordance with Article VI of OCGA § 39-3-2. By the time that McIntyre had returned to Georgia, the authorities had discovered the body of the victim and had probable cause to arrest him for murder. After being given his *Miranda* warnings, McIntyre made no incriminating statement to the sheriff. He did, however, make a spontaneous incriminating statement to his mother in the sheriff's presence. *Arizona v. Mauro*, 481 U. S. 520 (107 SC 1931, 95 LE2d 458) (1987). Under these circumstances, McIntyre's spontaneous statement to his mother was correctly admitted into evidence.

4. McIntyre requested a charge on impeachment "[b]y proof that the witness has been convicted of a crime of moral turpitude." However, the trial court refused to give this requested charge, on the ground that no certified copy of the conviction of any of the State's witnesses had been introduced by McIntyre.

The requirement that a prior conviction be proved by a certified copy is an application of the "best evidence" rule and an objection to proof of a prior conviction by secondary evidence may be waived. *Moret v. State*, 246 Ga. 5, 6 (3) (268 SE2d 635) (1980). See also *O'Toole v. State*, 258 Ga. 614, 616 (4), fn. 2 (373 SE2d 12) (1988); *Williams v. State*, 251 Ga. 749, 799 (12) (312 SE2d 40) (1983). Thus, in the absence of a "best evidence" objection, "a witness' answer to the effect that he or she has been convicted of a crime is admissible to prove the crime, [cit.]." *Williams,* supra at 799 (12).

On direct examination, Chapman admitted his conviction for the murder and there was no objection raised by McIntyre. On cross-examination, Chapman again admitted his conviction for the murder and there was no objection raised by the State. Murder is a crime of moral turpitude. It follows that the "best evidence" objection was waived and that Chapman's prior conviction of a crime of moral turpitude was proved by secondary evidence. Compare *O'Toole,* supra (no secondary evidence admitted without objection); *Mincey v. State*, 257 Ga. 500, 501 (1) (360 SE2d 578) (1987) (no secondary evidence admitted without objection); *Kimbrough v. State*, 254 Ga. 504, 505 (2) (330 SE2d 875) (1985) (no secondary evidence admitted without objection); *Williams,* supra (objection to secondary evidence raised); *Ledesma v. State*, 251 Ga. 885, 888 (4) (311 SE2d 427) (1984) (objection to secondary evidence erroneously overruled); *Timberlake v. State*, 246 Ga. 488, 499 (6) (271 SE2d 792) (1980) (objection to secondary evidence raised). Since Chapman's prior conviction of a crime of moral turpitude was proved by secondary evidence admitted without objection, it was error to refuse to give McIntyre's requested charge on impeachment.

However, harm as well as error must be shown for reversal. *Wood v. State*, 243 Ga. 273, 274 (5) (253 SE2d 751) (1979). The failure to give a requested charge which is authorized by the evidence can be harmless error. *Duvall v. State*, 259 Ga. 801, 802 (4) (387 SE2d 880) (1990). Even discounting Chapman's testimony, there was overwhelming evidence of McIntyre's guilt. *Burnette v. State*, 165 Ga. App. 768 (1) (302 SE2d 621) (1983). That evidence consists of the admissions of McIntyre, Chapman and Earnest which were heard by Earnest's cellmate, and McIntyre's admission to his mother. See *Meeker v. State*, 249 Ga. 780, 782 (5) (294 SE2d 479) (1982). This evidence was "unrefuted by any other evidence to the contrary." *White v. State*, 163 Ga. App. 179, 182 (3) (292 SE2d 875) (1982). Since the evidence

of McIntyre's guilt is overwhelming even when Chapman's testimony is discounted, it is highly probable that the erroneous failure to charge on impeachment by proof of a prior conviction for a crime of moral turpitude did not contribute to the jury verdict. "It was harmless and will not require a new trial. [Cit.]" *Duvall v. State*, supra at 803 (4). See also *Shaaghir v. State*, 264 Ga. 492, 493 (3) (448 SE2d 196) (1994).

5. Over McIntyre's relevancy objection, the trial court allowed the sheriff to testify that, when he attempted to question other purported members of the satanic group, they "took their rights" and refused to answer his questions.

However, McIntyre has failed to show any prejudice resulting from this passing reference to non-witnesses' out-of-court invocation of their "rights." Compare *Lingerfelt v. State*, 235 Ga. 139 (218 SE2d 752) (1975). Indeed, a witness' in-court invocation of his Fifth Amendment rights is not necessarily harmful. *Parrott v. State*, 206 Ga. App. 829, 832 (2) (427 SE2d 276) (1992). See *Lawrence v. State*, 257 Ga. 423, 425 (3), fn. 3 (360 SE2d 716) (1987). What is harmful is for the trial court to allow the State, once a witness has invoked his Fifth Amendment rights, "in effect, to testify for the witness and circumvent meaningful cross-examination as to obvious inferences. . . ." *Lawrence v. State*, supra at 425 (3), fn. 3. If a witness' mere in-court assertion of his Fifth Amendment rights is not necessarily harmful, then a passing reference to non-witnesses' mere out-of-court assertion of their rights, although irrelevant, is not prejudicial. Accordingly, the trial court erred in failing to sustain McIntyre's relevancy objection to the sheriff's testimony, but that error does not require reversal.

6. Evidence regarding satanism was properly admitted as relevant to the motive for the murder. *Whitener v. State*, 261 Ga. 567 (2) (407 SE2d 735) (1991).

7. The attack which McIntyre makes on the constitutionality of former OCGA § 15-11-5 (b) was rejected in the appeal of Chapman. *Chapman*, supra.

8. It was not error to fail to give McIntyre's written request to charge on voluntary manslaughter as a lesser included offense, since there was no evidence of provocation which would authorize a finding that the homicide was an act of voluntary manslaughter rather than murder. *Duquette v. State*, 265 Ga. 152, 153 (2) (454 SE2d 500) (1995).

9. McIntyre urges that the trial court erred in admitting hearsay testimony regarding statements made by Chapman after the termination of the conspiracy. However, the portions of the transcript wherein he contends that this occurred do not relate to the admission of any post-conspiracy statements attributed to Chapman. Instead,

they relate to post-arrest drawings and writings attributed to McIntyre himself. Since this enumeration of error is not supported by the transcript, it is without merit.

*Judgment affirmed. All the Justices concur, except Fletcher, P. J., and Sears, J., who concur in part and dissent in part.*

HUNSTEIN, Justice, concurring.

There is a significant possibility that a criminal defendant's trial may be rendered fundamentally unfair by the replacement, after evidence has been introduced but before the verdict is rendered, of the judge originally hearing the trial. In light of the serious consequences of the substitution process on a criminal defendant's trial, it behooves this Court to set forth guidelines trial judges should follow to ensure against any fundamental unfairness in future criminal trials.

I agree with several of the safeguards detailed in the dissenting opinion that would serve to eliminate the possibility of a substitution rendering a criminal trial fundamentally unfair. I would have the departing judge set forth on the record the reasons for which the departure is necessary. Those reasons must be of sufficient magnitude to justify the departure. Furthermore, all other alternatives to substitution should be fully explored and, except in situations where alternatives are clearly not applicable, the reasons behind the decision not to utilize them should also be set forth in the record. Finally, I would have the replacement judge scrupulously review the prior proceedings and state on the record his or her familiarity therewith so as to establish that the replacement judge is fully prepared to render informed rulings on any matters that might arise and to instruct the jury thoroughly.

Although there was no requirement that the above matters be made of record at the time of McIntyre's trial, an application of these safeguards to this case reveals no reversible error. The record establishes that the original judge carried on with his duties notwithstanding the personal anxiety that must have resulted from knowing of his grandchild's critical illness and that it was only with the child's tragic passing and upon his son's request for his father's presence that the judge determined it was no longer possible for him to continue sitting on the bench during the remainder of McIntyre's trial. There is no question that the death of the judge's grandchild excused him from the bench and, in light of the devastating and prolonged effect such a loss has on a deceased child's family, clearly justified the decision not to grant a continuance in the case.

As to the replacement judge's familiarity with the prior proceedings, I disagree with the dissent's intimation that the transcript re-

flects any impropriety on the part of the replacement judge.[2] The replacement judge did have available the transcripts of pre-trial motion hearings (which duplicated in large part the testimony adduced at trial before the original judge) and the replacement judge stated he would examine any portion of the trial transcript brought to his attention that defense counsel considered relevant to any ruling the court would be called upon to make. Because the record reflects that McIntyre failed to request any such examination, it is mere speculation whether or not the replacement judge's proposed method for rendering rulings would have been sufficient. Finally, while the record does not reflect affirmatively that the replacement judge was able to familiarize himself with the earlier trial proceedings, after a careful reading of the transcript, the objections raised and ruled upon, and the charge conference proceedings, I am convinced that, notwithstanding the absence of an affirmative statement on the record, McIntyre's right to a fair trial was not infringed upon by the substitution that occurred in this case.

Accordingly, because McIntyre has not shown reversible error and an independent examination of the record establishes that McIntyre's trial was not rendered fundamentally unfair by the substitution of the original judge, I can therefore concur with the majority's holding in Division 2. I fully concur in the remaining divisions.

SEARS, Justice, concurring in part and dissenting in part.

1. The majority opinion in Division 2 makes this the first State Supreme Court in the nation that has failed to acknowledge the established principle that the mid-trial substitution of a judge prejudices a criminal defendant's right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution. Despite the existence of an enormous body of instructive case and statutory law which establishes this principle, the majority opinion merely "as-

---

[2] The transcript reveals that defense counsel initially requested the replacement judge "out of an abundance of caution" to review only the transcripts of pre-trial motion hearings; the prosecutor stated he would provide the judge with the State's copy of the transcripts for the judge to review that night. No further discussion was had at that point and the trial proceeded. The next day, after defense counsel objected to the prosecution's suggestion that the judge review videotapes of the trial made by the media, the judge asked defense counsel to point out any particular harm that could result from the substitution. When defense counsel noted the technical jury instructions the defense would be requesting, the judge noted that the testimony on which the charges would be based had been taken down and stated, "it's available to the Court to review and the Court would have to make any ruling based on the testimony, would it not?" Defense counsel then expressed doubt whether the trial transcript would be prepared in time and the judge stated that the defense could select the necessary passages. The prosecution challenged defense counsel's claim that the transcript would not be ready, noting that the court reporter had been able in the past to prepare the daily trial transcript and could do so if required or requested. No such request or requirement was made a part of the record.

sumes, for purposes of this appeal only" that the mid-trial substitution of the judge in this case "implicated" McIntyre's right to a fair trial. Moreover, in its perfunctory analysis of the impact of the substitution of the judge in this case upon McIntyre's right to a fair trial, the majority has both relied upon authority that is not applicable to this case, and omitted crucial facts from its analysis. Although I recognize that the crime McIntyre was convicted of was heinous, depraved, and revolting, I cannot countenance this sort of legal analysis or its unconstitutional conclusion. I therefore strongly dissent to Division 2 of the majority opinion.

2. First, Division 2 of the majority opinion lacks any authority to support its conclusion. *People v. Espinoza*,[3] for example, is cited to support the inference that the mid-trial substitution of a trial judge may not "implicate" the right to a fair trial. Op. at 9.[4] However, *Espinoza* does not discuss the established principle that the right to a fair trial is prejudiced by the mid-trial substitution of a judge. That particular principle has been acknowledged by every State Supreme Court, save this one, to consider this question.[5] Further amplifying its misunderstanding of the basic constitutional principle of a fair trial, the majority opinion does not even address the impact of the mid-trial substitution of the judge in this case upon McIntyre's right to a fair trial, nor does it recognize the vast volume of authority that is contrary to its ruling.

Moreover, the majority fails to note that the substitution of the trial judge in *Espinoza* was made pursuant to California Penal Code § 1053, which legislatively provides for the substitution of a trial judge who becomes incapacitated and cannot complete the trial.[6] Similarly, the majority's citations to annotated legal compilations is misplaced, as they all concern Federal Rule of Criminal Procedure 25 (a), which prescribes constitutional safeguards to ensure that the right to a fair trial is not compromised when it becomes imperative that a

---

[3] 12 Cal. Rptr. 2d 682 (1992).

[4] In *Espinoza*, the California Supreme Court rejected certain reasoning discussed in *Freeman v. United States*, 227 F 732 (2nd Cir. 1915) that the right to a trial by jury means the right to a tribunal consisting of 12 jurors and a single judge, all of whom must remain constant throughout the trial. Id. at 759-760. *Freeman* reasoned *in part* that because the right to a trial by jury could not be waived, the right to a single judge was inviolate. Id. In light of the United States Supreme Court's subsequent ruling that the right to a jury trial *can* be waived, see *Patton v. United States*, 281 U. S. 276 (50 SC 253, 74 LE 854) (1930), it is hardly surprising that this particular line of reasoning from *Freeman* would be questioned. However, this only means that after *Patton*, a criminal defendant may consent to the substitution of the presiding judge. 2 C. Wright, Federal Practice & Procedure, § 392 (1982). Virtually all state and federal courts continue to adhere to *Freeman's* ruling that a judge in a criminal case may not be substituted after evidence has been adduced before the original judge. See 46 AmJur2d 332, § 249; notes 15-21, infra, and accompanying text.

[5] See notes 15-21, infra, and accompanying text.

[6] *Espinoza*, 12 Cal. Rptr. 2d at 695.

judge in a criminal trial be substituted.[7] In contrast, Georgia has no statutory provision that provides such safeguards to criminal defendants in this State. Finally, the trial judge in *Espinoza* was incapacitated and incapable of completing the trial due to chemotherapy treatments he was undergoing.[8] The judge presiding over McIntyre's trial faced a family emergency that required his temporary absence, but he was not incapacitated, inasmuch as he indicated on the record that he was capable of completing the trial after a continuance.

The majority's reliance at p. 9 upon *Koza v. State*[9] as support for its overbroad edict that "in Georgia, the temporary absence of a trial judge without suspension of the trial is not a basis for reversal unless the complaining party shows prejudice resulting from the absence" is also woefully misplaced. First, *Koza* dealt with the temporary absence of a judge during voir dire of the jury pool.[10] Virtually every court to have considered this issue, including authority relied upon by the majority, has agreed that the substitution of the trial judge does not impact upon the right to a fair trial until the first introduction of evidence, a position that is entirely consistent with *Koza*.[11] Second, the facts of this case do not involve the "temporary absence" of a judge during voir dire, but rather the wholesale substitution of the judge mid-way through the evidentiary portion of a criminal trial.[12]

Nor does *United States v. Boswell* support the majority's conclusion that the mid-trial substitution of a judge is generally subject to harmless error analysis. Op. at 9. The defendant in *Boswell* consented to the substitution of the judge during closing arguments, after the close of evidence,[13] and thus *Boswell*'s finding of harmless error is entirely consistent with the law in Georgia and other jurisdictions.[14] Fi-

---

[7] See 73 ALR Fed. 833, 839, § 4; 75 AmJur2d 444, § 222. The majority has overlooked the fact that, even with the added safeguard of Federal Rule 25 (a), at least one noted commentator maintains that, absent the defendant's consent, the substitution of a judge after the evidentiary portion of a criminal trial has begun is unconstitutional. See C. Wright, 2 Federal Practice & Procedure, § 392 (1982).

[8] *Espinoza*, 12 Cal. Rptr. 2d at 694, n. 1.

[9] 158 Ga. App. 709 (282 SE2d 131) (1981).

[10] Id., 158 Ga. App. at 710.

[11] See, e.g., n. 5, supra; *Jones v. State*, 57 Ala. App. 275 (327 S2d 913) (1975), cert. denied, 295 Ala. 409 (1976); *State v. Amarillas*, 141 Ariz. 620 (688 P2d 628) (1984); *People v. Rodriguez*, 786 P2d 472 (Colo. 1989); *People v. McCline*, 442 Mich. 127 (499 NW2d 341) (1993); *Bellah v. State*, 415 SW2d 418 (Tex. 1967); 46 AmJur2d 332, Judges, § 249; 83 ALR2d 1032, § 2 (b).

[12] Notably, the substitution in this case occurred almost exactly at the half-way point of the evidentiary period of the five-day trial — after two and one-half days of testimony, and at a point where the State had introduced forty-four of its eighty-eight pieces of evidence.

[13] 565 F2d 1338, 1341 (5th Cir. 1978). Contra *Randel v. Beto*, 354 F2d 496, 501 (5th Cir. 1965), cert. denied, 387 U. S. 935 (87 SC 2058, 18 LE2d 996) (1967).

[14] See *Griner v. State*, 162 Ga. App. 207, 211 (291 SE2d 76) (1982) (failure to object to substitution); *Strickland v. State*, 156 Ga. App. 475, 476-477 (274 SE2d 823) (1980) (defendant consented to substitution); *Throgmorton v. Trammell*, 90 Ga. App. 433, 435 (83 SE2d

nally, it should be noted that while the Texas Court of Appeals ruling in *Jimenez v. State*[15] appears to be an anomaly, this Court now enjoys the distinction of issuing the only majority opinion in the nation to cite that case. When considered against the volume of authority that is contrary to the majority opinion, which I discuss in Division 3 below, the vacuous authority cited by the majority thoroughly discredits the ruling that it purports to support.

3. While the question of whether different judges may preside over a criminal trial despite the objection of counsel is one of first impression for this Court, it has been addressed by other federal and state courts.[16] The opinions of these courts establish that the substitution of a judge during a trial must (1) be rigorously governed, (2) only be permitted when absolutely necessary and imperative to the due administration of justice, and (3) only be allowed after stringent safeguards are put in place to ensure that the accused's right to a fair trial suffers no prejudice as a result of the substitution.[17]

Until quite recently, virtually all jurisdictions have subscribed to a general rule that prohibits entirely the substitution of a judge in a criminal trial after the introduction of evidence and before the verdict is rendered.[18] The theory behind this general rule is that the only judge competent to instruct the jury and otherwise exercise his discretion is the judge who hears all of the testimony, observes the demeanor and forms opinions as to the credibility of all of the witnesses, and "knows something of the 'atmosphere' of the case."[19] It is, of course, axiomatic that jury instructions given by a judge must be tailored to the facts in evidence, and therefore necessarily require an application of the law to the particular facts of a case.[20] The general rule absolutely prohibiting judicial substitution reasons that a judge

---

256) (1954) (same); C. Wright, 2 Federal Practice & Procedure, § 392 (1982).

[15] 838 SW2d 661, 666 (Tex. App. 1992).

[16] Any intimation by the majority that this issue has previously been considered by Georgia courts is misguided. As noted, the majority's reference to *Koza* is misplaced, as the substitution at issue in that case took place during voir dire. See notes 8, 10, supra.

[17] See, e.g., *Randel v. Beto*, 354 F2d at 501; *Hood v. State*, 334 Md. 52, 57 (637 A2d 1208) (1994); *Commonwealth v. Thompson*, 328 Pa. 27, 29 (195 A 115) (1937); *State v. McKinley*, 7 Ohio App. 3d 255, 257 (455 NE2d 503) (1982).

[18] See *Thompson*, 328 Pa. at 29; *Freeman v. United States*, 227 F at 759-760; *People v. McCline*, 442 Mich. at 128; *Bailey v. State*, 397 NE2d 1024, 1026-1027 (Ind. Ct. App. 1979); *State v. Davis*, 564 SW2d 876, 878 (Mo. 1978); *State v. Johnson*, 55 Wash. 2d 594, 596 (349 P2d 227) (1960); *State v. McClain*, 194 La. 605, 612 (194 S 563) (1940); *Durden v. People*, 192 Ill. 493, 498 (61 NE 317) (1901); *Blend v. People*, 41 NY 604 (1870); *Commonwealth v. Zeger*, 200 Pa. Super. 92, 99 (186 A2d 922) (1962); see also 83 ALR2d 1032, Substitution of Judge in Criminal Case, § 2 (1962 and Supp. 1991); 46 AmJur2d 331, Special, Substitute, or Pro Tem Judges, § 249 (1994).

[19] *Thompson*, 328 Pa. at 29; see *McCline*, 442 Mich. at 131; *Johnson*, 55 Wash. at 596.

[20] *Durden*, 192 Ill. at 498; see *Nelson v. State*, 262 Ga. 763, 766 (426 SE2d 357) (1993); *Joiner v. State*, 163 Ga. App. 521, 523 (295 SE2d 219) (1982).

who assumes the bench after the first introduction of evidence does not have first-hand knowledge of what took place at the trial before the substitution, and therefore is not qualified to charge the jury properly.[21]

Some courts also have recognized that the right to a criminal trial by jury means a

> trial by a tribunal consisting of at least one judge and twelve jurors, all of whom must remain identical from the beginning to the end. . . . The continuous presence of the same judge and jury is equally essential throughout the whole of the trial.[22]

Under the general rule, a criminal defendant's right to a fair and impartial trial is prejudiced, and a reversal of any conviction is mandated, when he is denied adjudication of his guilt or innocence before a presiding judge with first-hand knowledge of all of the trial's proceedings.[23]

I agree with the general rule against substitution of a judge over a party's objection insofar as it recognizes that the due process right to a fair and impartial trial requires that the judge who charges the jury, exercises judicial discretion, and presides over the adjudication of innocence or guilt must be thoroughly knowledgeable of what has transpired during the trial. However, I disagree with the general rule insofar as it reasons that these necessary components of a fair trial can only be provided by a judge who gained his knowledge of a trial's proceedings due to his actual presence in the courtroom.

As explained below, I believe that there may be some rare instances when it is absolutely imperative to the due administration of justice to allow the substitution of a judge, so long as procedural and substantive safeguards are put in place to protect the defendant's right to a fair trial. For example, it may be necessary to substitute a presiding judge who becomes completely incapacitated, and incapable of fulfilling his duty to preside over an entire trial, at a late stage of

---

[21] *McCline*, 442 Mich. at 133 ("As a rule, a judge cannot finish the performance of a duty already entered upon by his predecessor where that duty involves the exercise of judgment and the application of legal knowledge to, and judicial deliberation of, facts known only to the predecessor."); *Thompson*, 328 Pa. at 29; *Durden*, 192 Ill. at 498; see *Johnson*, 55 Wash. at 596; *McClain*, 194 La. at 613; 83 ALR2d at 1033.

[22] *Freeman*, 227 F at 759-760. Accord *Davis*, 564 SW2d at 878; *Durden*, 192 Ill. at 500; see *Bailey*, 397 NE2d at 1026.

[23] See *Randel*, 354 F2d at 500; *McClain*, 194 La. at 605; *Durden*, 192 Ill. at 493; 83 ALR2d at 1033; cf. *Tumey v. Ohio*, 273 U. S. 510, 532 (47 SC 437, 71 LE 749) (1927) (affirming criminal defendant's right to an impartial judge; "[e]very procedure . . . which might lead [a judge] not to hold the balance nice, clear and true between the State and the accused denies the latter due process of law.").

proceedings in a lengthy and complex criminal trial which has consumed an inordinate amount of the parties' and court's time and resources. In that type of situation, the only alternative to substituting the incapacitated judge would be to declare a mistrial. However, depending upon the circumstances of the trial, the detrimental effect of a mistrial upon the court and the State may override the defendant's right to have the trial presided over by a single judge.

In those types of circumstances, with the aid of advanced techniques for recording trial proceedings, the procedures which are explained below would safeguard the right to a fair trial while simultaneously allowing the trial to continue before a substitute judge. Because the general rule's inflexibility does not provide for these types of rare instances, and cannot accommodate the few situations when judicial substitution should be allowed, I would reject the general rule's blanket prohibition against the substitution of a judge, and advocate the adoption of these procedural safeguards.

4. A number of States, as well as the federal government, have modified the general rule by establishing procedures to govern the exceptional instances when the substitution of a judge should be allowed over a party's objection.[24] These procedures, together with the cases noted in Division 3, provide guidance, ignored by the majority, for determining when and under what circumstances a judge may substitute for another judge during the course of a criminal trial after the first introduction of evidence and before the rendering of the verdict.

First, it should be unequivocal that the substitution of a judge should never be permitted except in the most extraordinary circumstances.[25] The exigency which necessitates the substitution should involve only the incapacitation of the presiding judge by either death or debilitating physical, psychological or emotional illness or trauma.[26] In short, the presiding judge must be incapable of performing her duty to preside over the trial. It should not be sufficient that the presiding judge has other engagements, duties or personal obligations.[27]

---

[24] See, e.g., Alaska Rules of Crim. Pro., Rule 25; Arizona Rules of Crim. Pro., Rule 19.5; California Penal Code at 1053; Delaware Court of Common Pleas Rules of Crim. Pro., Rule 25; Florida Rules of Crim. Pro., Rule 3.321; Iowa Rules of Crim. Pro., Rule 18 (7) (b); Maryland Rules of Crim. Pro., Rule 750; Massachusetts Rules of Crim. Pro., Rule 38; Minnesota Rules of Crim. Pro., Rule 26.03 (13); Nevada Revised Statutes at 175.091; North Dakota Rules of Crim. Pro., Rule 25; Ohio Rules of Crim. Pro., Rule 25; Puerto Rico Rules of Crim. Pro., Rule 186; Virgin Islands Rules of Crim. Pro., Rule 25; Virginia Code at 19.2-154; Wyoming Rules of Crim. Pro., Rule 26; Fed. R. Crim. Pro. 25 (a).

[25] *Randel*, 354 F2d at 501; *Hood*, 334 Md. at 57; *Thompson*, 328 Pa. at 28; *McKinley*, 7 Ohio App. 3d at 258.

[26] See *Randel*, 354 F2d at 501; *Hood*, 334 Md. at 56; *People v. Gonzalez*, 51 Cal. 3d 1179, 1210 (800 P2d 1159) (1990), cert. denied, 502 U. S. 835 (112 SC 117, 116 LE2d 85) (1991).

[27] See *Randel*, 354 F2d at 500-501.

Absent debilitating or incapacitating illness or trauma, substitution of a judge in a criminal trial should not be considered as an option.

Second, the substitution of a judge should be absolutely necessary.[28] By this I mean that no alternatives less drastic than substitution can be available. Whenever less drastic alternatives are available, and can be reasonably implemented, they should be opted for in lieu of substituting a judge. The overriding preference whenever possible should be for the presiding judge to order a continuance of the trial for a reasonable time. It should never be sufficient to forego such a continuance in favor of substituting a judge merely because it will be difficult for the trial court, the parties, counsel, or witnesses to reschedule their affairs in order to accommodate the continuance. The presiding judge also should consider all other possible alternatives to substitution, including reordering the witnesses, changing the order of the trial, and ordering a recess. Only when all practical alternatives to substitution have been considered and rejected for legitimate reasons on the record should the presiding judge consider whether the circumstances of the particular trial warrant allowing substitution.

Third, substitution of a judge should be imperative to the due administration of justice.[29] By this I mean that, on balance, the circumstances of the particular trial at the time of substitution should weigh in favor of allowing substitution rather than declaring a mistrial. Circumstances which should be weighed in making this determination include, but are not limited to, the number of witnesses who already have testified,[30] the length of the trial transcript, the amount of time consumed by prior proceedings, the expected amount of time necessary to complete the trial, the expense of retrial, the anticipated amount of time required for a substitute judge to familiarize himself with the record, the complexity of the facts and evidentiary issues of the case, the functions that a substitute judge likely will be called upon to perform,[31] and where the parties stand in their presentations of their cases.[32] Substitution of a judge should only be allowed after the presiding judge has balanced on the record all relevant characteristics of the particular trial and determined that they weigh in favor of substitution rather than declaring a mistrial.

Finally, in those rare instances when, after complying with the rules discussed above, it is determined that substitution of a judge should be allowed, before a substitute judge presides over the trial,

---

[28] *Randel*, 354 F2d at 501; *Hood*, 334 Md. at 57; *Thompson*, 328 Pa. at 29.
[29] *Randel*, supra; *Hood*, supra; *Thompson*, supra.
[30] See *McKinley*, 7 Ohio App. 3d at 256-257.
[31] Cf. *Hood*, 334 Md. at 57; *Gonzalez*, 51 Cal. 3d at 1211.
[32] See *McKinley*, 7 Ohio App. 3d at 256-257.

she should be required to certify on the record that she has reviewed the trial transcript and thoroughly familiarized herself with the prior proceedings, and is prepared to proceed with and finish the trial.[33] In order to accomplish this, a substitute judge ordinarily should read, or have read to her, a written transcript, listen to an audio recording, and/or listen to and watch a visual recording of the prior proceedings.[34] Regardless of the method used, the end result should give a substitute judge a sufficient grasp of the prior testimony and proceedings to enable her fairly and effectively to exercise her discretion in issuing rulings, and properly to instruct the jury.[35] A substitute judge's certification should specify the method used to gain familiarity with the record, and any objections to the method specified must be entered at the time of certification, as must be all other objections to the substitution of a judge.[36]

Absent compliance with the rules discussed above, it should be presumed that the substitution of a judge has prejudiced a criminal defendant's right to a fair and impartial trial, and a new trial should be awarded unless the presumption of prejudice is rebutted.[37] However, when properly followed, these rules would adequately safeguard a criminal defendant's right to a fair and impartial trial, by ensuring that the judge who charges the jury, otherwise exercises his discretion, and presides over the adjudication of innocence or guilt is thoroughly knowledgeable of what has transpired during the trial.

5. In this case, Judge Noland's relinquishment of the bench to Judge James was not done in a manner which safeguarded McIntyre's right to a fair trial. First, the record fails to support a finding that Judge Noland was debilitated and incapable of presiding over McIntyre's trial. The loss of Judge Noland's grandchild was tragic and traumatic, and would have justified an extended temporary absence from the bench. However, nothing in the record supports a finding that his unfortunate loss constituted an incapacitating trauma. Contrary to the concurring opinion, I do not in any way mean to imply that the death of a family member cannot be an incapacitating or debilitating event; common sense and decency dictate otherwise.[38] I

---

[33] *Hood*, 334 Md. at 56, 59; *McKinley*, 7 Ohio App. 3d at 257.

[34] *Hood*, 334 Md. at 57-58.

[35] See *Hood*, 334 Md. at 58-59.

[36] See *Hood*, 334 Md. at 58. In this regard, Georgia case law concurs with the majority of jurisdictions that a criminal defendant may consent to judicial substitution or waive any objection thereto on appeal by failing to object at the time of substitution. See *Griner v. State*, 162 Ga. App. 207, 211 (291 SE2d 76) (1982) (failure to object to substitution); *Strickland v. State*, 156 Ga. App. 475, 476-477 (274 SE2d 823) (1980) (defendant consented to substitution); *Throgmorton v. Trammell*, 90 Ga. App. at 435 (same).

[37] See *Hood*, 334 Md. at 62; *McKinley*, 7 Ohio App. 3d at 257-258; see 2 C. Wright, Federal Practice & Procedure, § 392 (1982).

[38] See *Randel*, 354 F2d at 501.

merely note that the record in this case fails to support such a finding.

Second, it was not necessary to substitute the judge in this case because a continuance could and should have been ordered. Judge Noland left the bench on June 8, 1988, in order to attend a funeral held on the following morning. Allowing time to spend with his family, surely a priority under the circumstances, it would have been reasonable to expect Judge Noland to resume his position on the bench within seven days. Hence, a continuance of no more than one week, while slightly inconvenient, would have been eminently possible and certainly preferable to the drastic step of substituting the judge. The State's claim that a continuance would have been problematic because of its busy trial calendar and the scheduling of its witnesses was insufficient to preclude ordering a continuance. Under these circumstances, where a continuance was the most reasonable and efficient means available, I believe that it was error not to order that the trial be continued until Judge Noland could resume his place on the bench and fulfill his duty to preside over the trial.

Third, the trial court erred in failing to balance the circumstances of McIntyre's trial at the time of substitution and determine whether the due administration of justice favored allowing substitution rather than declaring a mistrial. Because the trial court failed to make this determination by balancing factors such as, inter alia, how much time McIntyre's trial had already consumed, the anticipated amount of time necessary to complete McIntyre's trial, the expense of retrial, whether rulings on any evidentiary issues were pending, and whether the State had nearly completed the presentation of its case against McIntyre, there is no record from which to determine whether the due administration of justice warranted permitting the substitution of Judge Noland.

Finally, despite defense counsel's request that he do so, Judge James expressed reluctance to review the transcript of prior proceedings, and before assuming the bench failed to certify for the record that he had reviewed the trial record and was prepared to preside over and complete the trial. Indeed, contrary to the concurring opinion, the only logical conclusion to be drawn is that Judge James did not review the record before taking the bench, as he became the presiding judge only 15 minutes after Judge Noland stepped down. I believe that Judge Noland's failure to comply with these rules governing the substitution of a judge, along with Judge James' failure to familiarize himself with the prior proceedings before taking the bench, deprived McIntyre of a fair trial by (1) allowing the substitution of a judge when it was not absolutely necessary, and without first determining whether it was imperative to the due administration of justice; and (2) permitting a judge who was not knowledgeable of the entire

trial's proceedings to preside over the adjudication of guilt or innocence, charge the jury, and otherwise exercise judicial discretion.

6. The majority opinion incorrectly states that the "general rule" is that the substitution of judges is subject to harmless error analysis. Not only do the cases cited by the majority fail to support this ruling, recent United States Supreme Court rulings lead me to conclude that the erroneous substitution of a judge and resulting denial of the right to a fair trial is one of the very limited class of errors that is not susceptible to harmless error analysis.

The current test for determining which errors are subject to harmless error analysis was established in *Arizona v. Fulminante*.[39] In *Fulminante*, the Supreme Court divided errors into two types: trial errors and structural defects.[40] Harmless error analysis applies to trial errors, while structural defects remain subject to automatic reversal.[41] The plurality in *Fulminante* defined "trial errors" as errors in the trial process that occur in a party's presentation of its case, and can therefore be quantitatively assessed.[42] On the other hand, "structural defects" are errors that affect the framework or the conduct of the trial.[43] While there are few "structural defects," the Supreme Court noted that they include, inter alia, the right to an impartial judge, the right to counsel, and the right to a public trial.[44] Structural defects, it should be noted, cannot be harmless because they create a "serious risk of injustice which infects the trial itself."[45] Unlike the vast majority of errors, a structural error cannot be quantitatively assessed "in the context of other evidence presented" in order to determine whether "its admission" was harmless beyond a reasonable doubt.[46]

The error of substituting a judge without the imposition of constitutional safeguards to ensure the preservation of the right to a fair trial is not capable of being qualitatively assessed with "other evidence" to determine whether "its admission" was harmless beyond a

---

[39] 499 U. S. 279, 307-308 (111 SC 1246, 113 LE2d 302) (Rehnquist, J., plurality op.) (1991). Notably, the majority and the cases that it relies upon do not concern themselves with *Fulminante*.

[40] 499 U. S. at 307-308.

[41] Id.

[42] Id.

[43] Id.

[44] Id.

[45] *Cuyler v. Sullivan*, 446 U. S. 335, 343 (100 SC 1708, 64 LE2d 333) (1980). See also Project, Twenty-Fourth Annual Review of Criminal Procedure: United States Supreme Court and Court of Appeals 1993-1994, 83 Geo. L.J. 1, 1363 (1995); Note, Ake v. Oklahoma and Harmless Error: The Case for a Per Se Rule of Reversal, 81 Va. L. Rev. 521, 538 (1995); Carter, Harmless Error in the Penalty Phase of a Capital Case: A Doctrine Misunderstood and Misapplied, 28 Ga. L. Rev. 125, 130 (1993); Note, Harmless Error Analysis in Louisiana After Fulminante, 66 Tul. L. Rev. 1086, 1088 (1992).

[46] *Fulminante*, 499 U. S. at 307-308.

reasonable doubt.[47] Rather, the error that occurred in this case when Judge Noland relinquished the bench effected a structural defect in the constitution of the trial mechanism itself, created a serious risk of injustice, and infected the integrity of McIntyre's criminal adjudication.[48] Hence, it is not susceptible to harmless error analysis. I therefore would order that this matter be remanded to the trial court for a new trial.

7. I agree with Division 4 of the majority opinion that the trial court erred in failing to give McIntyre's requested jury charge regarding witness impeachment. I write separately in order to highlight the change in our precedent that this ruling represents.

The majority's ruling recognizes that, for purposes of a requested charge on witness impeachment, there is no basis for distinguishing between the State's failure to object to a line of testimony sought on cross-examination, and the State's elicitation of that same line of testimony on direct examination. If the former constitutes a waiver of the best evidence rule, then so must the latter. In this case, the State waived its best evidence objection for purposes of the witness impeachment charge sought by the defense when it elicited on direct examination its own witness's admission to a prior criminal conviction. Having elicited such an admission from its own witness, the State cannot complain that the conviction is not established for purposes of a jury charge on impeachment without a certified copy of the conviction.

I am authorized to state that Presiding Justice Fletcher joins in this partial concurrence and partial dissent.

DECIDED NOVEMBER 6, 1995 —
RECONSIDERATION DENIED DECEMBER 4, 1995.

*J. M. Raffauf*, for appellant.
*David McDade, District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Paige R. Whitaker, Assistant Attorney General*, for appellee.

---

[47] Id.
[48] See id.; *Cuyler*, 446 U. S. at 343.