S11A0536. BORING v. THE STATE.
(711 SE2d 634)

HUNSTEIN, Chief Justice.

Appellant Courtney Boring was convicted of murdering her mother, Debra Boring, and sentenced to life imprisonment plus a consecutive five-year term for firearm possession.[1] Because the trial court allowed the State to introduce improper and prejudicial character evidence at trial, appellant's conviction must be reversed.

Construed in the light most favorable to the verdict, the evidence adduced at trial established as follows. On the evening of December 23, 2005, Rodney Boring, the victim's husband, placed a 911 call to report the shooting of his wife. Rodney told police that he had been

---

[1] On June 27, 2006, appellant was indicted by a Gilmer County grand jury on one count of malice murder and one count of firearm possession in connection therewith. Following a jury trial held January 29 through February 8, 2007, appellant was convicted on both counts and sentenced to life imprisonment plus five years to be served consecutively. Appellant's timely motion for new trial, as amended, was heard on May 13, 2010 and June 21, 2010 and was denied on September 3, 2010. Appellant filed her notice of appeal on September 10, 2010, whereupon the case was docketed in this Court to the January 2011 term and thereafter submitted for decision on the briefs.

at a catfish pond approximately one-quarter of a mile away from their home, where he typically went after work to drink liquor, when he heard what he recognized as a gunshot from a large caliber gun. He reported that, a few minutes later, he received a phone call from appellant, his 15-year-old daughter, who was in hysterics and mostly unintelligible but managed to communicate that "momma shot herself." Rodney immediately went to their home, where he found appellant sobbing and his wife lying dead in the doorway of the front door on top of her purse and some Wal-Mart shopping bags, with a gaping gunshot wound to the back of the head and his .270 bolt-action rifle on the floor nearby.

Appellant told police that late that afternoon she had been at home taking a shower while her mother went to Wal-Mart; that she was getting dressed after her shower when she heard her mother call out her name, which she ignored; and that, a short time later, she heard a loud noise and walked into the living room to find her mother lying in the doorway with the rifle beside her. Appellant stated that she did not attempt to render aid to her mother or call 911 but rather immediately grabbed the phone, ran outside, and called her father. She reported neither seeing nor hearing any other person in or around her house before, during, or after the shooting; a police search of the home found no one else present. The investigator who interviewed appellant at the scene described her demeanor as "very unusual" for one experiencing such a traumatic event, in that appellant was calm, seemed "agitated with me like it was a bother," and did not exhibit sadness.

The State's firearms expert determined through testing that Rodney's rifle was in fact the murder weapon. Rodney told investigators that he had cleaned the rifle that morning in preparation for a hunting trip and had left it in the house on a love seat with live rounds of ammunition on an adjacent table. Though fingerprints were lifted from the rifle, they were of insufficient quality to use for identification. Gunshot residue was found on the victim's hands, which, according to one of the State's forensics experts, was consistent with the theory either that she had fired the weapon or that she was less than eight to ten feet from the weapon when it was fired. However, the State's forensic pathologist, who performed the autopsy, opined that the manner of death was homicide, not suicide. Two other expert witnesses agreed with the conclusion that the fatal wound was not self-inflicted: the State's crime scene specialist testified to his conclusion that the gun had been fired from a particular area inside the house near the front door; the State's firearms expert likewise opined that the shot had been fired from inside the house, by someone other than the victim, from a distance of four to nine feet away.

The condition of the Borings' home, as observed by responding investigators and documented in photographs admitted at trial, was filthy and, according to the testimony of one investigator, not fit for a child to inhabit. A neighbor of the Borings testified that he had on previous occasions heard arguments coming from their home and had seen patrol cars at the house. There was also evidence that Rodney was an alcoholic who was verbally abusive to both his wife and daughter.

The lead investigator in the case, GBI special agent Natalie Brunner, testified that appellant became the target of the investigation based on "mostly a matter of elimination, simply the fact that we could not put a third party there and both the rifle and ammunition came from inside the Boring residence, and to the best that we could establish, there were no other parties present." There was no evidence of forced entry into the house, and both the Borings' neighbor and Rodney's brother, Ricky, who had driven past the Boring home between 6:15 and 6:30 p.m. that day, told police they did not recall seeing any activity or vehicles at the Boring home around the time of the shooting. Though appellant told police she had the light on in her bedroom at the time of the shooting, Ricky reported having noticed that no lights were on in the residence when he drove by. There was evidence that appellant knew how to operate small caliber rifles but that she had had no instruction with respect to large caliber weapons such as the gun used in the shooting.

The State adduced evidence that, seven to ten days before the shooting, appellant had had a dispute with her parents after having been caught sneaking out of the house to meet up with her boyfriend, 19-year-old Joel Linville. After this incident, appellant, with the victim's approval, arranged to live with her aunt, Anita Ingle, though within a few days of the move Ingle and the victim agreed that appellant would return home because Ingle had discovered the teenager had again left the house with Linville without permission.

Appellant has at all times denied shooting her mother. In several interviews with police during an approximately two-month period after the murder, she consistently denied any involvement, albeit with minor variances in certain details, and likened her conflicts with her parents to those of the typical teenager. Though police interviewed 20 to 30 people, including appellant's friends as well as teachers and school officials, these efforts yielded no evidence implicating appellant in the shooting or any other act of violence. Police also enlisted Linville's assistance in questioning appellant about the shooting, but Linville conveyed nothing that incriminated her. Appellant did not testify at trial, but the jury viewed videotapes of two of her lengthy interviews with police, in which she resisted investigators' repeated efforts to elicit a confession.

Linville was considered as a suspect by investigators and ruled out, as there was evidence corroborating his testimony that he had been at work at a nearby fast food restaurant at the time of the shooting. Cell phone records confirmed Rodney's testimony that a phone call was placed to his cell phone from the Borings' home phone around the time that the shooting occurred, followed a few minutes later by a call from Rodney's cell phone to 911.

1. We find that the evidence, while far from overwhelming, was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that appellant was guilty of the crimes of which she was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). See also OCGA § 24-4-6 (evidence must be sufficient to exclude all reasonable hypotheses save that of defendant's guilt to warrant conviction on circumstantial evidence).

2. Appellant contends that the trial court committed reversible error by allowing the State to present irrelevant and highly prejudicial character evidence. We agree. At the conclusion of Agent Brunner's direct examination, the State introduced, over defense objections, various items of evidence seized from the 15-year-old's bedroom during the police investigation, including photographs of appellant with dyed black hair and dark make-up; a document bearing the words of a "curse" to be recited "while burning the letter over a black candle"; and seven different inscriptions, one typewritten and the rest handwritten on the bedroom walls, of song lyrics and quotations attributed to various singers and other artists, bearing themes of anguish, enslavement, atheism, and violence.[2] Though the State elicited no elaboration from any of its witnesses regarding the import of these items, the State explicitly sought in both opening and closing to link these items with the so-called "gothic lifestyle" and to characterize them as evidence of "satanic influences."

Specifically, in opening, the prosecutor stated:

> We want to show you, and it will be extremely important, this Defendant's what we call state of mind in law. We all have some state of mind. We have a bent of mind, things that we think about that make us what we are, our thoughts. We believe there even is a depravity of mind here.
>
> You will see certain things about [appellant's] lifestyle. I, in voir dire, mentioned some things about gothic lifestyle. . . .

---

[2] Two of the quoted song lyrics, for example, read as follows:
"I am not a slave – to a god who doesn't exist";
"if I had it my way the f***in' sun would be GONE."

We're attempting to show you by these things what's going on in this Defendant's mind at the time of this killing.

We will show you also that she had these inscriptions on the wall. I won't go through all of them. You will see them. Pay close attention to writings that this 15-year-old has on her wall. We . . . believe you will see some inkling of satanic influences here.[3]

In his closing argument, the prosecutor's recitation of the evidence both began and ended with references to these items. After displaying the photographs and reading aloud the inscriptions, the prosecutor acknowledged that these items do not "prove" that appellant killed her mother but went on to state: "It's not the point. The point is . . . that these are pieces of a puzzle, and you have to consider all of the evidence together." The prosecutor further contended in closing that some of the inscriptions were quotations from the "founder of the Satanic Church" — despite the absence of any evidence of record to support this claim — and again emphasized that these items "must be taken as pieces of a puzzle." The prosecutor ended his closing by reading the words of the aforementioned "curse." In sum, this evidence was clearly integral to the State's strategy of portraying appellant as a deviant capable of murdering her mother, in the absence of any other evidence suggesting she had a violent or angry nature.

"Whether to admit evidence is a matter resting in the trial court's sound discretion, and evidence that is *relevant and material to an issue in the case* is not rendered inadmissible because it incidentally places the defendant's character in issue. [Cit.]" (Emphasis supplied.) *Wolfe v. State*, 273 Ga. 670, 674 (4) (a) (544 SE2d 148) (2001). Though we have on numerous occasions affirmed the admission of evidence regarding a defendant's affiliation with controversial organizations or belief in unpopular ideologies, in all such instances this evidence was *directly* relevant to a contested issue in the case such as motive, identity, or intent. See, e.g., id. at 674 (4) (trial court properly admitted evidence of gang involvement where State adduced evidence that defendant committed crimes at request of fellow gang members and was required to participate therein under gang's code of conduct); *Clark v. State*, 271 Ga. 6, 9 (4) (515

---

[3] Though defense counsel immediately objected on foundation grounds to the prosecutor's reference to "satanic influences" and the trial court sustained the objection, no curative instruction was given, and the prosecutor went on to state, "[w]e will show you certain verses and things that she had in her possession out there. You will make a decision about what those things mean about her state of mind, her bent of mind, and her depravity of mind."

SE2d 155) (1999) (evidence of defendants' "membership in an unsavory group," though incidentally bearing on their character, admissible when alleged motive for crime "directly involve[d]" such membership); *Mize v. State*, 269 Ga. 646 (3) (501 SE2d 219) (1998) (trial court properly allowed evidence of defendant's racist beliefs and leadership role in Ku Klux Klan-like organization because it was relevant to State's theory as to motive). In this case, by contrast, the State theorized that appellant had committed the murder to avenge her mother's interference in the teenager's relationship with Linville; appellant's alleged "gothic"/satanic beliefs bore no specific nexus with the crime. Compare *McIntyre v. State*, 266 Ga. 7 (1), (6) (463 SE2d 476) (1995) (evidence regarding defendant's membership in satanic cult properly admitted where testimony showed murder was in retaliation for victim's refusal of defendant's sexual advances and where defendant performed satanic ritual over victim's dead body); *Whitener v. State*, 261 Ga. 567 (2) (407 SE2d 735) (1991) (admission of defendant's notebook containing references to occult proper where defendant told witness he hoped to become a vampire and had wanted to drink the victim's blood and keep his head). Agent Brunner in fact affirmatively conceded that she had discovered no such nexus, testifying on cross-examination that she had contacted an expert on satanic rituals as part of her investigation but was unable to link any of the evidence surrounding the murder with any such ritual. Compare *Corza v. State*, 273 Ga. 164, 166 (2) (539 SE2d 149) (2000) (evidence of appellant's gang membership admissible where witnesses described "ritualistic gestures" believed to be gang signs appellant made immediately after shooting); *McIntyre*, supra at 8 (1) (evidence of satanic ritual performed over victim's body).

In addition, in the numerous cases such as those cited above in which we have upheld the admission of evidence of a defendant's association with an "unsavory" organization or ideology, there was actual evidence adduced at trial affirmatively linking the defendant to the organization or ideology in question. Here, by contrast, nothing in the evidence adduced explicitly referenced satanism or "gothic" beliefs or subculture, and there was no testimony actually linking the inscriptions and other evidence in question to any such ideology; rather, that link was forged only via the State's opening statement and closing argument, which itself was improper. See *Sumlin v. State*, 283 Ga. 264, 266 (2) (658 SE2d 596) (2008) (prosecutor "improperly injected new evidence" during closing argument); *Alexander v. State*, 270 Ga. 346 (2) (509 SE2d 56) (1998) (prosecutor's description of defendant's alleged gang ties in opening statement held reversible error where no evidence of such presented at trial).

In sum, "one is left with the feeling that the [evidence in

question] was employed simply because the jury would find these beliefs morally reprehensible." *Dawson v. Delaware*, 503 U. S. 159, 167 (112 SC 1093, 117 LE2d 309) (1992) (finding improper the admission of evidence of defendant's membership in organization called "the Aryan Brotherhood"). In admitting this evidence, which bore no specific connection with the crime and operated merely to impugn appellant's character by suggesting she held satanic beliefs, the trial court abused its discretion. Both because the nature of this evidence was highly inflammatory, and because the evidence of appellant's guilt was entirely circumstantial and not overwhelming, " 'we cannot say that it is highly probable that the error did not contribute to the jury's verdict.' [Cit.]" *Lindsey v. State*, 282 Ga. 447, 450 (2) (651 SE2d 66) (2007) (applying harmless error standard for nonconstitutional error).[4]

3. We find appellant's remaining enumerations unlikely to recur on retrial and thus decline to address them. See *Ward v. State*, 288 Ga. 641 (5) (706 SE2d 430) (2011).

*Judgment reversed. All the Justices concur.*

DECIDED MAY 31, 2011 —
RECONSIDERATION DENIED JUNE 27, 2011.
Murder. Gilmer Superior Court. Before Judge Weaver.
*Jimmonique R. S. Rodgers*, for appellant.
*Joe W. Hendricks, Jr., District Attorney, Darrell E. Wilson, Assistant District Attorney, Samuel S. Olens, Attorney General, Mary Beth Westmoreland, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Jason C. Fisher, Assistant Attorney General*, for appellee.

---

[4] "Having reversed the judgment under the nonconstitutional harmless error test we do not reach [appellant's contention that] the error here is of constitutional magnitude." *Johnson v. State*, 238 Ga. 59, 62 (230 SE2d 869) (1976).