Robert Paul McINTYRE, Petitioner-Appellant,

v.

Doug WILLIAMS, Warden, Respondent-Appellee.

No. 99-10989

Non-Argument Calendar.

United States Court of Appeals,

Eleventh Circuit.

June 30, 2000.

Appeal from the United States District Court for the Northern District of Georgia.(No. 97-01581-CV-MHS-1), Marvin H. Shoob, Judge.

Before ANDERSON, Chief Judge, and TJOFLAT and BARKETT, Circuit Judges.

ANDERSON, Chief Judge:

Robert Paul McIntyre appeals the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On appeal, he argues that the substitution of one judge for another during his jury trial for murder constituted a denial of his constitutional rights. For the reasons stated below, we affirm.

On January 11, 1988, Malissa Earnest and Teresa Simmons ran away from a group home for troubled youth in Georgia that was being attended to by house mother Peggy Casteel. After being picked up as hitchhikers by Greg Fischbeck, Fischbeck brought Earnest and Simmons to Terry Chapman Belcher who gave them shelter. On January 18, Robert McIntyre was reported missing by his mother; she also reported a missing van. Louisiana police officers pulled the van over and detained McIntyre, Belcher, and Earnest over night at the police station.[1] Cara Stone, who happened to be staying in the same cell as Earnest, which was nearby McIntyre and Belcher, reported what she had heard from these three. Meanwhile, Earnest left the next morning, and McIntyre and Belcher consented to being returned to Georgia and were so returned. The Louisiana police officers relayed what Stone had reported to law enforcement in Douglas County, Georgia.

---

[1]Earnest actually stayed at the police station voluntarily because she had nowhere else to stay and was waiting for someone to send her money for bus fare back to Georgia.

Acting on this report, the Douglas County Sheriff's Department searched the woods near the home of Belcher's grandmother, Bessie Mae Newton, (the "Newton house") and discovered Simmons' body in a shallow grave. A boot lace, which was used to strangle her, was still around her neck.

On March 1, 1988, a Douglas County, Georgia, grand jury indicted McIntyre, Belcher, and Earnest for the malice murder of Simmons. On June 6, 1988, McIntyre's jury trial began with Judge Robert Noland presiding. After two and one half days of trial, including jury selection and part of the State's case, Judge Noland had to leave unexpectedly to attend the funeral of his infant grandson. McIntyre moved for a continuance or a mistrial; Judge Noland denied the motion and instead Judge Robert James was substituted. Judge James presided the remaining two and one half days. On June 10, 1988, the jury returned a verdict of guilty and Judge James sentenced him to life imprisonment, the only sentence for malice murder. Judge James denied McIntyre's motion for new trial on May 28, 1993.

On direct appeal, McIntyre made a number of arguments including that the substitution of judges violated his constitutional rights. Addressing the substitution issue, *inter alia,* the Supreme Court of Georgia affirmed his conviction and sentence. *See McIntyre v. State,* 266 Ga. 7, 463 S.E.2d 476 (1995). The U.S. Supreme Court denied his petition for certiorari. *See McIntyre v. State,* 518 U.S. 1021, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996).

On May 30, 1997, McIntyre petitioned the U.S. District Court for the Northern District of Georgia for a federal writ of habeas corpus pursuant to 28 U.S.C. § 2254. On December 22, 1998, a U.S. magistrate judge recommended that the petition be denied. Agreeing with this recommendation, the district court denied the petition. McIntyre filed a notice of appeal and moved for a certificate of appealability, but the district court denied the motion. This Court, however, issued a certificate of appealability limited to review of the substitution issue.

McIntyre argues that the substitution of judges violated his rights under the Sixth and Fourteenth Amendments. This violation, he argues, was a structural defect not subject to harmless error analysis and, therefore, required automatic reversal. Alternatively, he argues that he was prejudiced by the substitution.[2]

Because McIntyre filed his federal habeas petition on May 30, 1997, after the effective date (April 24, 1996) of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), AEDPA's review provisions concerning the state court's adjudication of the issue apply. Explaining the effect of these provisions, the Supreme Court recently stated:

> Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."
>
> . . . .
>
> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams v. Taylor,* --- U.S. ----, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000) (quoting 28 U.S.C. § 2254(d)).[3] The Supreme Court also addressed the meaning of unreasonable application:

> Defining an "unreasonable application" by reference to a "reasonable jurist," however, is of little assistance to the courts that must apply § 2254(d)(1) and, in fact, may be misleading. Stated simply, a federal habeas court making the "unreasonable application" inquiry should ask whether the state

---

[2]We decline to address McIntyre's other arguments because there is no certificate of appealability with respect to them.

[3]Section 2254 provides in part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

court's application of clearly established federal law was objectively unreasonable. The federal habeas court should not transform the inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case. The "all reasonable jurists" standard would tend to mislead federal habeas courts by focusing their attention on a subjective inquiry rather than on an objective one....

The term "unreasonable" is no doubt difficult to define. That said, it is a common term in the legal world and, accordingly, federal judges are familiar with its meaning. For purposes of today's opinion, the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law.... Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 1521-22.[4] In sum, we can only reverse the district court if we conclude that the state court's decision was contrary to, or involved an objectively unreasonable application of, the governing Federal law set forth by Supreme Court cases. If we cannot so conclude, we must affirm.

We turn to the Georgia Supreme Court's decision regarding the substitution of judges to determine if it is contrary to or involved an unreasonable application of clearly established Federal law, as determined by the U.S. Supreme Court. The Georgia Supreme Court assumed that the midtrial substitution of judges implicated McIntyre's Sixth and Fourteenth Amendment rights, but did not cite any U.S. Supreme Court case to that effect. *See McIntyre v. State,* 266 Ga. 7, 463 S.E.2d 476, 479 (1995). It held that the substitution of judges was not a structural defect requiring automatic reversal, but rather was subject to harmless error analysis. *See id.* The court concluded that McIntyre was not harmed by the substitution, and therefore reversal was not required. *See id.*

---

[4]In addressing the meaning of the unreasonable application prong of § 2254(d), this Court in *Neelley v. Nagle,* 138 F.3d 917, 924-25 (11th Cir.1998), held that "[t]he state court decision must stand unless it is not debatable among reasonable jurists that the result of which the petitioner complains is incorrect." The *Williams* Court rejected that aspect of the Fourth Circuit's interpretation of unreasonable application which incorporated the reasonable jurist standard; the Fourth Circuit had held that a state court applies federal law unreasonably if done in a manner that reasonable jurists would all agree is unreasonable. *See Williams,* 120 S.Ct. at 1521-22. In light of this rejection, the viability of this aspect of *Neelley* is questionable. We, therefore, make an objective inquiry into reasonableness in accordance with *Williams.*

**4**

As the Supreme Court of Georgia did, we assume *arguendo* that the midtrial substitution of judges implicated McIntyre's Sixth Amendment rights, and we address whether the Georgia court's decision in applying harmless error was contrary to clearly established Federal law as determined the Supreme Court, or involved an unreasonable application thereof. McIntyre primarily argues that the substitution of judges is a structural defect requiring automatic reversal. He points to a number of state court decisions that indicate that the substitution of trial judges during the presentation of evidence at a criminal trial over defendant's objection is reversible error. *See Bailey v. State,* 397 N.E.2d 1024, 1026-27 (Ind.Ct.App.1979); *State v. Davis,* 564 S.W.2d 876, 878-79 (Mo.1978), *Commonwealth v. Zeger,* 200 Pa.Super. 92, 186 A.2d 922, 926-27 (1962), *People v. McCline,* 442 Mich. 127, 499 N.W.2d 341, 343-44 (1993), *Blend v. People,* 41 N.Y. 604 (1870), *State v. McClain,* 194 La. 605, 194 So. 563 (1940); *State v. Johnson,* 55 Wash.2d 594, 349 P.2d 227 (1960). However, he does not cite any U.S. Supreme Court cases, nor have we uncovered any, that indicate that the substitution of judges is a structural defect requiring automatic reversal.[5] In fact, we have found no case in which the Supreme Court has addressed the constitutional propriety of substituting judges under these circumstances. As a result, we cannot say that the state court's conclusion that the substitution is an error subject to harmless error analysis and not a structural defect is contrary to clearly established Federal law as determined by the U.S. Supreme Court.

In assessing the reasonableness of the state court's conclusion, we turn for guidance to *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), and *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). In *Brecht,* the Court explained that constitutional violations

---

[5]McIntyre claims that *Patton v. United States,* 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930), holds no substitution is permitted unless the defendant consents and that *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), requires automatic reversal for the substitution of judges. McIntyre's citations are misplaced. *Patton* was concerned with the reduction of a jury from twelve to eleven due to one juror's illness. *See Patton,* 281 U.S. at 287, 50 S.Ct. at 254. In *Patton,* the Supreme Court did not address the substitution of judges. In *Sullivan,* the Court reversed because the trial judge gave an unconstitutional definition of reasonable doubt, which the Court deemed a structural defect. *See Sullivan,* 508 U.S. at 281-82, 113 S.Ct. at 2082-83.

classified as trial errors are subject to harmless error analysis and those classified as structural defects require automatic reversal. *See Brecht,* 507 U.S. at 629, 113 S.Ct. at 1717. In *Fulminante,* the Court provided lists of both trial errors and structural defects. Trial errors include unconstitutionally overbroad jury instructions at the sentencing stage of a capital case, admission of evidence at the sentencing stage of a capital case in violation of the Sixth Amendment Counsel Clause, jury instructions containing an erroneous conclusive presumption, jury instructions mistaking an element of the offense, jury instructions containing an erroneous rebuttable presumption, erroneous exclusion of defendant's testimony regarding the circumstances of his confession, restriction on a defendant's right to cross-examine a witness for bias in violation of the Sixth Amendment Confrontation Clause, denial of a defendant's right to be present at trial, improper comment on defendant's silence at trial in violation of the Fifth Amendment Self-Incrimination Clause, statute improperly forbidding trial court's giving a jury instruction on a lesser included offense in a capital case in violation of the Due Process Clause, failure to instruct the jury on the presumption of innocence, confession obtained in violation of *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), admission of evidence obtained in violation of the Fourth Amendment, admission of identification evidence in violation of the Sixth Amendment Counsel Clause, admission of the out-of-court statement of a nontestifying codefendant in violation of the Sixth Amendment Confrontation Clause, and denial of counsel at a preliminary hearing in violation of the Sixth Amendment Counsel Clause.[6] *See Fulminante,* 499 U.S. at 307,

---

[6]With respect to the last two trial errors listed above, the Supreme Court in *Fulminante* described them as the admission of the out-of-court statement of a nontestifying codefendant in violation of the Sixth Amendment Counsel Clause and the denial of counsel at a preliminary hearing in violation of the Sixth Amendment Confrontation Clause. Apparently, the Supreme Court inadvertently transposed the clauses, *i.e.,* as indicated in the cases cited by the Supreme Court for the respective propositions, the first trial error is in fact a violation of the Confrontation Clause and the second of the Counsel Clause. *See Brown v. United States,* 411 U.S. 223, 231, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208 (1973) (citing *Bruton v. United States,* 391 U.S. 123, 126, 88 S.Ct. 1620, 1622, 20 L.Ed.2d 476 (1968) ("admission of [nontestifying codefendant's] confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment.")); *Coleman v. Alabama,* 399 U.S. 1, 7, 90 S.Ct. 1999, 2002, 26 L.Ed.2d 387 (1970) (citing *United States v. Wade,* 388 U.S. 218, 224-25, 87 S.Ct. 1926, 1931, 18 L.Ed.2d 1149 (1967) ("In recognition of these realities of modern criminal prosecution, our cases have construed the Sixth Amendment guarantee to apply to 'critical' stages of the proceedings. The guarantee reads: 'In all criminal

111 S.Ct. at 1263. "The common thread connecting these [trial errors] ... is that each involved [an] error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of the other evidence presented in order to determine whether its admission was harmless." *Id.* at 307-08, 111 S.Ct. at 1264.

On the other hand, structural defects include the total deprivation of right to counsel at trial, a judge who is not impartial, the unlawful exclusion of members of defendant's race from a grand jury, the right to self-representation at trial, and the right to public trial. *See id.* at 309-10, 111 S.Ct. at 1265. "Each of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds." *Id.* at 310, 111 S.Ct. at 1265. In *Brecht,* the Court described structural errors as follows: "At the other end of the spectrum of constitutional errors lie structural defects in the constitution of the trial mechanism, which defy analysis by harmless-error standards. The existence of such defects-deprivation of the right to counsel, for example-requires automatic reversal of the conviction because they infect the entire trial process." *Brecht,* 507 U.S. at 629-30, 113 S.Ct. at 1717 (internal quotation marks, citation, and footnote omitted).

McIntyre argues that the substitution of judges is like a biased judge. We disagree; there is a meaningful difference. Unlike the substitution of judges, the presence of an impartial judge "infects the entire trial process," *id.* at 630, 113 S.Ct. at 1717, and is one of those " 'basic protections [without which] a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' " *Fulminante,* 499 U.S. at 310, 111 S.Ct. at 1265 (quoting *Rose v. Clark,* 478 U.S. 570, 577-78, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986)). McIntyre never alleges that either trial judge was not impartial. Moreover, in *United States v. Boswell,* 565 F.2d 1338, 1342

_____

prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.' ")). We have described these trial errors above without the transposition.

(5th Cir.1978),[7] the former Fifth Circuit applied a harmless error analysis to the improper substitution of a magistrate judge for an ailing district court judge for four hours during a criminal trial.[8] The state court was not unreasonable in concluding that the error assumed here was more like the trial errors than the structural defects listed in *Fulminante* and therefore a trial error subject to harmless error analysis.[9] As a result, we cannot say that the state court's conclusion that the substitution is not a structural defect but rather a trial error subject to harmless error analysis involves an unreasonable application of clearly established Federal law as determined by the U.S. Supreme Court.

Alternatively, McIntyre argues that he was prejudiced by the substitution. After carefully reviewing the record, we note the following. Judge Noland conducted the pretrial hearings and presided for the first two and one half days of trial. He presided over selection of the jury. He also presided over the opening arguments of both sides and the beginning of the State's case. While Judge Noland presided, the State put eight witnesses on the stand: 1) Warren Tillman, a medical examiner for the State Crime Laboratory, who had conducted an autopsy on Simmons' body and who testified about bruises on Simmons' body and ligature marks around her neck which indicated she was strangled;[10] 2) Peggy Casteel, the employee working at the

---

[7]Fifth Circuit decisions enacted prior to October 1, 1981 are binding precedent in the 11th Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

[8]Federal Rule of Criminal Procedure 25(a) provides: "If by reasons of death, sickness or other disability the judge before whom a jury trial has commenced is unable to proceed with the trial, any other judge regularly sitting in or assigned to the court, upon certifying familiarity with the record of the trial, may proceed with and finish the trial." Thus, a substitution under certain circumstances is permissible under the federal rules. The error to which the *Boswell* Court applied a harmless error analysis was not the substitution per se, but the fact that a magistrate judge was substituted for an Article III district court judge where another Article III district court judge should have been substituted for the ailing Article III district court judge.

[9]Our analysis below of McIntyre's argument that he was prejudiced reinforces our conclusion that the state court was not unreasonable. Our analysis suggests that the substitution of judges is not an issue which "def[ies] analysis by 'harmless-error' standards." *Brecht,* 507 U.S. at 629, 113 S.Ct. at 1717.

[10]While Tillman was on the stand, the State introduced some pre-autopsy photographs of Simmons' body that Tillman had taken.

group home from which Simmons and Earnest ran away, who testified that Simmons and Earnest ran away on the evening of January 11, 1988;[11]  3) Greg Fischbeck, a friend of Belcher, who testified that he picked up two hitchhikers, Simmons and Earnest, took them to Belcher, and never saw McIntyre;  4) Benjamin Pearson, a Douglas County deputy sheriff, who testified that McIntyre's mother reported to him that McIntyre and her van were missing;  5) Bill Landry, a detective sergeant of the Gonzales, Louisiana, city police department, who testified that he pulled over the missing van on January 26, 1988, found McIntyre, Belcher, and Earnest inside, brought them to the police station, detained McIntyre and Belcher over night, permitted Earnest voluntarily to stay in a nearby cell overnight, heard Earnest say she was pregnant by Belcher, and helped arrange the return of McIntyre and Belcher to Georgia and who also testified that Cara Stone was detained nearby the three;  6) Israel Moreno, another Gonzales police officer, who testified that he assisted Landry in pulling over the van;  7) James Groody, a third Gonzales police officer, who testified that he helped return McIntyre and Belcher to Georgia under an interstate agreement;[12]  and 8) James Skinner, Douglas County Sheriff's Department crime scene investigator, who testified about the discovery, appearance, and recovery of Simmons body from its shallow grave and other physical evidence discovered including a rope used to tie a blanket around the body, which matched rope at the Newton house, a shovel, a wheelbarrow, a boot lace found wrapped around Simmons' neck, and a pair of boots with one lace missing found at the Newton house.[13]  The credibility and testimony of these witnesses was not meaningfully contested.

---

[11]While Casteel was on the stand, the State introduced the runaway note left by Simmons and Earnest at the group home.

[12]While Groody was on the stand, the State attempted to admit the waiver of extradition form that McIntyre had executed.  Defense counsel objected because the officer allegedly knew that McIntyre was suspected of murder at this point, due to a report from Cara Stone, but did not inform McIntyre of this knowledge.  Judge Noland overruled the objection and admitted the form into evidence.

[13]While Skinner was on the stand, the State introduced in evidence the physical evidence noted above and various pictures of the grave, the body, and the physical evidence.

On the third day, Judge Noland announced that he had to leave to attend the funeral of his infant grandson. Defense counsel moved for a continuance and for mistrial. Judge Noland denied these motions and instead indicated that Judge James would preside in his place. After an approximately fifteen minute recess in which Judge Noland conferred with Judge James about the case, Judge James took the bench. At that point, Judge Noland considered and denied McIntyre's motion in limine to exclude all evidence and testimony concerning satanism or satanic rituals.[14] Importantly, to that point, no such evidence or testimony had been adduced.

Judge James presided over the State's remaining seven witnesses: 1) Terry Chapman Belcher, a high school friend of McIntyre, who testified extensively about how he, McIntyre, and Earnest killed Simmons by strangulation with boot lace from Belcher's boots at the Newton house, spoke a satanic chant over the dead body, tied a blanket around the body with rope from the house, wheeled her in a wheelbarrow into the nearby woods, buried her in a shallow grave, and then a day later fled Georgia in McIntyre's mother's van; Belcher also testified about his and McIntyre's involvement in satanism and satanic rituals; 2) David Belcher, Terry Chapman Belcher's stepfather, who testified seeing his stepson, McIntyre, and Earnest at the Newton house around the time of the Simmons killing; 3) Cara Stone, Earnest's cellmate for the night in Gonzales, who testified that she heard Earnest, McIntyre, and Belcher talking about their killing of Simmons and that she reported this information to a detective when the three left their cells; 4) Rodney Howard, a detective of the Douglas County Sheriff's Department, who testified that he received information concerning Stone's reports of the killing from Landry, picked up McIntyre and Belcher at the airport, took them into custody, and participated in the recovery of Simmons' body; 5) Earl Lee, Sheriff of Douglas County, who testified, among other things, that in his presence McIntyre told his mother, "I did [it], Mama, yes, I did, Mama, I tied the knot off."; 6) Phil Miller, a major for the Douglas County Sheriff's Department, who testified about recovering

---

[14]Throughout the remainder of the State's case, defense counsel repeated his objection to the evidence and testimony about satanism and satanic rituals, but Judge James overruled these objections because such evidence and testimony related to the motive for the murder.

a satanic drawing from the residence of Michael Brackett, a member of Belcher's cult; and 7) Mark Carter, a sergeant of the jail for the Douglas County Sheriff's Department, who testified about recovering some drawings from the trash from McIntyre's cell.[15] After the State rested, McIntyre moved for mistrial and directed verdict. Judge James denied these motions. The defense rested. Judge James instructed the jury and received its verdict of guilty. He then imposed a life sentence.

McIntyre claims he was prejudiced in five ways. First, McIntyre argues that the trial court's duty under *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to grant a motion for directed verdict where no rational trier of fact could have found proof of guilt beyond a reasonable doubt was compromised because Judge James did not see all of the evidence personally. We find no prejudice because the testimony of Belcher alone, all of which Judge James heard, was sufficient proof to permit a rational trier of fact to find McIntyre guilty beyond a reasonable doubt and because the evidence adduced before Judge James took the bench was in no way exculpatory. Moreover, our careful review of the record reveals that the great weight of the evidence against McIntyre was adduced after Judge James assumed the bench.

Second, McIntyre argues that the trial judge's duty to instruct the jury was compromised since the judge who instructed the jury did not even hear some of the evidence. However, McIntyre's only complaints regarding jury instructions are Judge James' denial of McIntyre's requests for instructions on voluntary manslaughter and on impeachment by proof that the witness, in this case Belcher, had been convicted of a crime involving moral turpitude. Judge James was completely informed to make a decision regarding the propriety of a voluntary manslaughter instruction because all evidence of McIntyre's state of mind was presented while Judge James presided. Moreover, neither in his request to the trial court for the instruction on voluntary manslaughter nor in his appellate brief to this Court has McIntyre pointed to any evidence of provocation before or after the substitution, besides the circumstance that music was playing. *See McIntyre,*

---

[15]These drawings, which were admitted into evidence, included a sketch of a dagger piercing a bleeding heart.

463 S.E.2d at 481 ("It was not error to fail to give McIntyre's written request to charge on voluntary manslaughter as a lesser included offense, since there was no evidence of provocation which would authorize a finding that the homicide was an act of voluntary manslaughter rather than murder."). Accordingly, we do not find that McIntyre was prejudiced by the substitution with respect to Judge James' denial of this instruction request. Likewise, Judge James was completely informed regarding the request for the impeachment instruction. He presided during the testimony of Belcher, the only witness convicted of a crime of moral turpitude. Thus, McIntyre was not prejudiced by the substitution in this respect.[16]

Third, McIntyre argues that it was necessary for the trial judge to weigh all the satanic evidence in ruling upon McIntyre's motion for mistrial. As noted above, all the satanic evidence was introduced while Judge James was on the bench, so Judge James was able to weigh all of this evidence when considering McIntyre's motion for mistrial based on this evidence. As a result, we fail to see how McIntyre was prejudiced by the substitution with respect to Judge James' denial of this motion.

Fourth, McIntyre argues that Judge James could not determine the sufficiency of the evidence or determine the admissibility of the confession because he could not assess the credibility of all the witnesses. As noted with McIntyre's first claim of prejudice, Belcher's testimony, which Judge James could fully assess, was sufficient evidence alone for conviction and the evidence that Judge James did not personally hear was not exculpatory. As for the admission of the confession, while Judge James presided, Sheriff Lee testified about McIntyre's confession to his mother and the circumstances surrounding it. Thus, Judge James was in a position to assess the sheriff's credibility and the admissibility of the confession. The substitution did not prejudice McIntyre with respect to the sufficiency of evidence and the admission of his confession.

---

[16]Judge James denied McIntyre's request for this impeachment instruction because the defense never introduced a certified copy of Belcher's conviction. The Georgia Supreme Court found that Judge James erred by not giving this impeachment instruction because Belcher testified that he was convicted and the State failed to object thus waiving any best evidence objection. *See McIntyre,* 463 S.E.2d at 480. The substitution of judges, however, is not the reason for Judge James' error because he was presiding when Belcher testified and thus when the State waived this objection. In any event, the Georgia Supreme Court found the error harmless. *See id.* We agree.

**12**

Lastly, McIntyre argues that because Judge James did not personally preside over the whole trial he could not properly set aside the verdict and grant a new trial in the event the verdict was strongly and decidedly against the weight of the evidence or a miscarriage of justice. McIntyre is especially concerned here with the intent element of the crime. We do not believe McIntyre was prejudiced in this manner because all evidence of McIntyre's intent was introduced while Judge James presided. We also note that the record suggests that Judge James had access to a transcript of those proceedings that took place during his absence and that he indicated an intention of reviewing same, in particular any portions suggested by defense counsel. *See McIntyre,* 463 S.E.2d at 482 & n. 2 (Hunstein, J., concurring). Finally, after carefully reviewing the record, we agree with the Georgia Supreme Court that there was overwhelming evidence to support the jury's guilty verdict. Accordingly, we cannot conclude that the finding of no prejudice by that court was an unreasonable application of clearly established Federal law as determined by the Supreme Court. In sum, we conclude that McIntyre was not prejudiced by the substitution.

For the reasons stated above, we

AFFIRM.[17]

---

[17]McIntyre's request for oral argument is denied.